# UNITED STATES DISTRICT COURT
## DISTRICT NEW JERSEY

_____

)
LLDVF, L.P.,                                    )
                                                )
              Plaintiff                         )
                                                )          No. 09-CV-01280-JLL-CCC
              v.                                )
                                                )      **Amended Complaint for**
ROBERT J. DINICOLA, FRANCIS M. ROWAN,           )      **Violation of the Federal**
PETER P. COPSES, ANDREW S. JHAWAR,              )      **Securities Laws and**
LINENS INVESTORS, LLC, APOLLO LINENS            )      **Negligent Misrepresentation**
INVESTORS, LLC, LEE S. NEIBART,                 )
BRIAN PALL, NRDC REAL ESTATE                    )
ADVISORS I LLC, MICHAEL A. GATTO,               )
SILVER POINT CAPITAL FUND                       )
INVESTMENTS LLC and APOLLO                      )      **JURY TRIAL DEMANDED**
MANAGEMENT V, L.P.                              )
                                                )
              Defendants.                       )
_____)

        This action is brought by LLDVF, L.P. ("plaintiff" or "Levine" or "LLDVF"), an

investor in certain notes issued by Linens 'n Things, Inc. ("Linens" or the "Company"), against

certain current and former officers and directors of Linens and its controlling persons, Apollo

Management V, L.P., affiliates thereof, Silver Point Capital Fund and NDRC Real Estate

Advisors I LLC for negligently representing the financial condition and future prospects of the

Company from at least March 27, 2007 until May 2, 2008, the date on which Linens filed for

bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code.

## NATURE OF ACTION

        1.      From its seven-store modest beginning in 1975, Linens grew to be the nation's

second-largest specialty store, behind only Bed Bath and Beyond. Linens' business focused on

housewares, textiles, and home décor. In or about November 1996, Linens became a public company, with its common stock listed on the New York Stock Exchange. By the time of its demise in 2008, Linens grew to over 580 stores located across the United States and Canada.

2.     In November 2005, affiliates of Apollo Management L.P. and others (detailed below) bought substantially all of the common stock of Linens in what has been termed a "Leverage Buyout Transaction" or "LBO."   In connection with the LBO, Linens recapitalized and, *inter alia,* issued certain senior secured floating rate notes, which are the subject of this litigation.  These notes are collateralized by substantially all of the Company's "equipment, intellectual property rights and related general intangibles," or most of the Company's "long-lived assets," which were subject to regular review for impairment of value as required by Generally Accepted Accounting Principles ("GAAP") and related Securities and Exchange Commission ("SEC") regulations and rules.

3.     However, to conduct an accurate "impairment analysis," the Company must be able to reasonably accurately forecast same store sales revenues and cash flows.   In a response to a September 15, 2008 SEC comment letter, Linens conceded that it needed to hire an outside consultant to improve the Company's deficient "liquidity and cash-flow forecasting and modeling" practices, and belatedly hired a consultant in or about mid-March 2008 to do so.

4.     The response to the comment letter revealed that defendants' forecasting of same store sales disregarded the current years' results and negative trends.  For instance, in October of 2007, the board approved management's 2008 forecast of well less than a 4% decline in same store sales, when Linens reported same store sales for the first three quarters of 2007 of negative 5.2%, 7.3% and 1.4%, respectively.  As explained further below, this was not the only trend and factors apparently ignored by defendants when forecasting revenues and\or cash flows.

5.      On March 20, 2008, defendants tacitly conceded that they prioritized "operations" to the detriment of the financial end of the business: "However, even as we've made operational progress, we recognize that the financial side of the business has been sorely deficient," including failure to pay more attention to "the timing and decline in the home industry over the past two years."   [March 20, 2008 Tr. at 1].   Indeed, at a conference call where defendants were asked, as they frequently were, about deteriorating macroeconomic conditions and its effects on expected results, one of the defendants responded by stating, "[t]he truth is that we are so busy focusing internally on the things that we can control, we have very little time to take into vast account what is occurring beyond our control."  [August 16, 2006 Tr. at 15].

6.      One analyst, who was so frustrated at defendants' apparent lack of attention to "the financial end of the business," exclaimed at the November 13, 2007 conference call to one of the individual defendants, "So I guess I'm struggling to find out where – here you are bleeding cash and talking about things like the bridal business. When are we going to start seeing some better numbers?"  Tr. at 14.

7.      Despite a clearly poor macroeconomic environment, defendants maintained that their nine-year turnaround plan was on track, based on exceedingly optimistic and unrealistic sales forecasts despite poor historical same store sales statistics and existing negative trends. Thus, defendants continually maintained it was unnecessary to take steps such as closing stores, including "underperforming ones."  In fact, defendants only closed two stores in 2006 and none in 2007.   In contrast, forty-nine stores were opened in 2006 and 2007.  Incredibly, defendants continued to open stores in the 2008 first quarter, only weeks before the Company filed for bankruptcy.  Linens opened more stores in the 2008 first fiscal quarter (seven) than they did in the first fiscal quarter of 2007 (two).  [May 13, 2008 press release]

8.      However, regardless of whether defendants kept scores of underperforming stores open, Linens was nonetheless required to follow GAAP with respect to asset impairment and other charges.   Indeed, Linens stated that it adopted GAAP-compliant accounting policies concerning impairment of long-lived assets, which, among other things, included store property, plant and equipment and leasehold improvements.   As detailed below, this was not the case.

9.      From the time Linens was purchased in or about February 2006 until May 2, 2008, by not properly applying its stated policies, defendants portrayed Linens' financial condition significantly better than it was, to the detriment of noteholders such as Levine.   While Linens often stated that the "top 100" stores produced 30% of all revenues, the Company also took materially deficient impairment charges on assets associated with stores, including the underperforming "C stores," which increased from approximately 175 to 305 by the fourth quarter of 2007.

10.     Notwithstanding, for the 2007 fourth fiscal quarter defendants took no impairment charges.   Instead, defendants repeatedly made reassuring statements that the performance of the underperforming C stores was improving greatly.

11.     However, on May 2, 2008, shortly after the hiring of the forecast modeling expert, the Company announced the closing of 120 underperforming stores and took $36.4 million in charges for "the non-cash accelerated write-down of the book value of certain underperforming property, equipment, and certain identifiable assets related to 120 stores the Company currently plans to close."  [Form 8-K at A-2, May 15, 2008].   Additional store closures were announced in the summer of 2008 – months before Linens converted its reorganization into liquidation.

12.     Since filing for bankruptcy, Linens has not filed the required quarterly filings on Form 10-Q as required by the SEC for the express reason: that "the Company is performing an

impairment analysis related to certain of its tangible and intangible assets, which is not yet complete." [Form 12b-25, at 3, May 13, 2008].

13.     The reasonably accurate unimpaired carrying value of the Company's "equipment, intellectual property rights and related general intangibles" was important to Levine, as noteholders had a first-priority secured interest in such.   In addition, Levine had a secondary security interest in much of the other store-related assets of the Company, such as inventory and accounts receivables.

14.     Thus, also important to plaintiff was whether vendors were tightening credit terms.  As explained below, beginning not later than in the first fiscal quarter of 2007, the days payables outstanding ("DPO") metric decreased substantially by at least 20% compared to both 2005 and 2006.   Nevertheless, defendants consistently denied that vendors were demanding payment sooner. This response is not plausible given the uninterrupted negative trend in DPO, the fact that the defendant CEO acknowledged no later than January 2008 that the Company could not pay its bills and "the situation at Linens was dire for a while," and a vendor suit alleged that the Company lost its vendor credit insurance around the same time.

15.     Finally, subsequent to the filing of the bankruptcy proceedings, Linens received a comment letter dated September 15, 2008 from the Staff of the SEC, Division of Corporate Finance addressed to Linens' Chief Financial Officer, defendant Rowan, inquiring about, among other things, why, given the assurances contained in the 2007 10-K filed on March 20, 2008 concerning Linen's liquidity position that Linen's "disclosures do not provide a discussion of any doubt as to the company's ability to continue as a going concern.  In light of the fact that the company filed for bankruptcy under Chapter 11 as of May 2, 2008, please tell us why there is no discussion of the company's liquidity problems in the 10-K."

16.     One week from the date of the SEC letter, on September 22, 2008, the Company announced on Form 8-K that "[o]n September 22, 2008, Francis M. Rowan resigned as of October 6, 2008, as Senior Vice President, Chief Financial Officer . . ."

17.     On October 18, 2008, Linens responded to the SEC's comment letter. In substance, Linens' response was that its boiler-plate risk warnings concerning liquidity concerns were sufficient. However, notably absent from such "warnings" was the required language the SEC sought:, *i.e.,* "there is substantial doubt as to the company's ability to continue as a going concern."

## JURISDICTION AND VENUE

18.     This action arises pursuant to Sections 18 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78r and 78t.  The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and on Sections 1331 and 1337(a) of the Judicial Code, 28 U.S.C. §§ 1331, 1337(a); the court has supplemental jurisdiction over the alleged state law claims under 28 U.S.C. § 1367.

19.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 1391(b) of the Judicial Code, 28 U.S.C. § 1391(b).   The principal executive office of the Company is located in this District and many, if not all, of the acts and transmissions complained of herein, including the preparation and dissemination of materially false and misleading information, occurred in this District.

20.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

## PARTIES AND RELEVANT NON-PARTIES

### A.  LINENS-N-THINGS, INC.

21.     As described more fully below, Linens, a Delaware corporation, is a wholly-owned subsidiary of Linens Holdings Co., an entity formed in connection with the acquisition of Linens and its affiliates by Apollo Management V, L.P. and others on February 14, 2006 (the "Acquisition").  Prior to the Acquisition, Linens' common stock was publicly traded on the New York Stock Exchange.   Pursuant to the Form 10-K for the fiscal year ended December 30, 2006 (the "2006 10-K") filed with the Securities and Exchange Commission (the "SEC") on March 27, 2007, Linens boasted that it was the second largest specialty retailer of home textiles, house wares and home accessories in North America, operating 571 stores in 47 U.S. states and six Canadian provinces as of December 30, 2006.   On May 1, 2008, the Company abruptly filed for protection under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, Wilmington, Delaware.   In or about October of 2008, the debtor-in-possession, just as abruptly, moved to liquidate all of its assets and cease operations.  Defendants were at least negligent in their communications to investors, including Levine, concerning its financial condition and future prospects.  But for its bankruptcy, Linens would be named as a defendant herein.

### PLAINTIFF

22.      Levine Leichtman Capital Partners Deep Value Fund L.P., plaintiff, is a limited partnership formed under the laws of the State of Delaware.

23.      Levine purchased in the open market a total of $43,500,000 face amount of Linens' Senior Secured Floating Rate Notes (LIBOR + 5.625%), interest payable quarterly (on

January 15, April 15, June 15 and October 15), maturing January 15, 2014 (the "Notes").

Accrued, but unpaid interest on the Notes, as of the time of Linen's bankruptcy filing was

approximately $1,250,232.63.   Levine made its first purchase of the Notes on May 4, 2007 and

its last purchase on November 16, 2007.  Levine has not sold any of the Notes it purchased.

24.     The Notes were issued jointly and severally by Linen 'n Things, Inc. and Linens

'n Things Center, Inc., pursuant to a registration statement and prospectus filed with the SEC in

or about August 2006.

## DEFENDANTS

25.     Richard J. DiNicola ("Nicola") became Chairman of the Company's board of

directors and its President and Chief Executive Officer in February 2006 upon the consummation

of the acquisition of Linens by Apollo and others (described below) in February 2006 (the

"Acquisition"), replacing 18-year company veteran Norman Axelrod, as Chairman and CEO.

DiNicola has operated in the retail industry for 34 years.  At the time of the Acquisition and

thereafter, DiNicola also was the Executive Chairman of GNC Corporation and General

Nutrition Centers, Inc. and was in that capacity since October 2004. DiNicola also served as the

Senior Retail Advisor for Apollo Management, L.P., and an affiliate of defendant Apollo

Management V L.P.  DiNicola is a graduate of St. Peter's College in New Jersey.   DiNicola

spoke at quarterly conference calls, signed the false and misleading 2006 and 2007 Form 10-Ks

and all 2007 quarterly reports furnished on Forms 10Q, and was quoted in Company press

releases.   As of March 1, 2007, DiNicola owned 120,243 shares of Linens' common stock.

26.     Francis M. Rowan ("Rowan") became the Company's Senior Vice President and

Chief Financial Officer in April 2006.   Rowan joined Linens in 1989 as the Budget Manager. He

was promoted in April 1993 to Director of Inventory Control and promoted to Assistant

Controller in November 1995, Executive Director in August 1999 and Vice President in August

2000.  In or about late 2006, Rowan became a Divisional Vice President.   Rowan graduated with

a B.S. in Accounting from St. Peter's College and a Master of Business Administration degree

from Montclair State University.  As of March 1, 2007, Rowan owned 1,875 shares of the

common stock of Linens.  Rowan spoke at quarterly earnings conference calls, signed the false

and misleading 2006 and 2007 Form 10-Ks and quarterly reports furnished on Forms 10-Q.

     27.     Peter P. Copses ("Copses") became a member of the Linens' board of directors

in February 2006 upon the consummation of the Acquisition.  Copses became a founding senior

partner at Apollo Management L.P., one of the "Sponsors" of the Acquisition (described more

fully below), in 1990.   As of March 1, 2007, Copses beneficially owned 12,965,000 shares of

the common stock of Linens or 99.3% thereof.[1]  Copses was chairman of the board's audit

committee, also comprised of directors defendant Michael A. Gatto and Damian J. Giangiacomo.

Beneficial shares owned by Copses included 5000 shares of common stock that were represented

by currently exercisable options, and 12,960,000 shares of common stock beneficially owned by

Linens Investors.  Linens Investors is controlled by its manager, defendant Apollo Management

V, L.P.   Copses signed the false and misleading 2006 and 2007 10-Ks.

     28.     Andrew S. Jhawar ("Jhawar") became a member of the Linens' board of directors

in February 2006 upon consummation of the Acquisition.  Jhawar is a partner of Apollo

Management L.P., where he had been employed since February 2000.  Jhawar also was chairman

of Linen's Compensation Committee.   Jhawar beneficially owned 12,960,000 shares of the

common stock of the Company as of March 1, 2007.  Jhawar signed the false and misleading

---

[1]  Under SEC rules, *inter alia,* a person is deemed to be the beneficial owner of any securities of which that person
has the right to acquire beneficial ownership within 60 days.   SEC Rule 13d-3.

2006 and 2007 10-Ks.  The Company only had two board committees, the audit and compensation committees.

29.      Linens Investors LLC ("Linens Investors") is the nominal stockholder of the Company.  Linens Investors, a special purpose entity that was created in connection with the Acquisition, is controlled by Apollo Linens Investors LLC and its affiliates, which together with NRDC Real Estate Advisors I LLC and Silver Point Capital Fund Investments LLC, and their respective affiliates, own all of the membership interests in Linens Investors.   The address of Linens Investors is c/o Apollo Management V, L.P., 10250 Constellation Boulevard, Los Angeles, California 90067.  Linens Investors directly owned 12,960,000 shares of the Company, as of March 1, 2007.

30.      Apollo Linens Investors LLC ("Apollo Linens Investors") is controlled by its manager, Apollo Management V, L.P., Copses and Jhawar.   The address of each of the foregoing, including Apollo Linens Investors is c/o Apollo Management V, L.P., 10250 Constellation Blvd., Los Angeles, CA 90067.

31.      Lee S. Neibart ("Neibart") became a member of the board of directors in February 2006 upon consummation of the Acquisition.   Neibart had been a partner of Apollo Real Estate Advisors since 1993 and also was partner in NRDC Advisors.  Niebart signed the false and misleading 2006 and 2007 10-Ks.   The Company lists Niebart's address as c/o NRDC Real Estate Advisors I LLC, 3 Manhattanville Road, Purchase, New York 10577.

32.      Brian Pall ("Pall") became a member of the board of directors on October 20, 2006.  Pall also was managing partner of NRDC Real Estate Advisors, where he has been employed since 2004.  Pall also was a member of Linen's Compensation Committee.   Pall signed the false and misleading 2006 and 2007 10-Ks.

10

33.     Michael A. Gatto ("Gatto") became a member of the board of directors in February 2006 upon the consummation of the Acquisition.  Gatto also was a partner at defendant Silver Point Capital Fund Investments LLC.   Gatto together with defendant Copses and non-defendant Giangiancomo were the three members on the Company's audit committee during 2007.  Gatto signed the false and misleading 2006 10-K.  In a Form 8-K filed on August 21, 2007, it was reported that defendant Gatto resigned from Linens' Board and Audit Committee effective August 17, 2007.  Defendant Rowan signed the Form 8-K.  Therein, it stated, "To the knowledge of the registrants, Mr. Gatto did not resign due to any disagreement with the registrants' operations, policies, or practices." Gatto was replaced by Ron Marshall, a certified public accountant, who appeared to be unrelated to the Sponsors.  *Id.*

34.     NRDC Real Estate Advisors I LLC ("NRDC") together with Apollo Linens Investors and Silver Point Capital Fund Investments LLC, and their respective affiliates, own all of the membership interests of Linens Investors, which owned 99.3% of the common stock of the Company as of March 1, 2007.   Linens lists NRDC's address at 3 Manhattanville Road, Purchase, New York 10577.

35.     Defendant Silver Point Capital Fund Investments LLC ("Silver Point") together with Apollo Linens Investors, NRDC Real Estate Advisors and their respective affiliates, own all of the interests of Linens Investors, which in turn owned 99.3% of the common stock of Linens as of March 1, 2007.

36.     Apollo Management V L.P. ("Apollo Management V") together with defendants Copses and Jhawar were controllers and managers of Apollo Linens Investors.  Apollo Linen Investors, together with Silver Point, NRDC Real Estate Advisors and their respective affiliates,

11

own all of the interests of Linens Investors, which in turn owned 99.3% of the common stock of Linens as of March 1, 2007.

## BACKGROUND

### A.    The History and Growth of Linens

37.    In 1988, then-owner Melville Corporation hired Norman Axelrod to be Linens's Chief Executive Officer.  Soon thereafter, the "superstore" concept was launched – with Linens opening 100 stores of 20,000 square feet or more by 1995.  As Linens opened superstores, it closed its smaller traditional stores, which averaged only 10,000 square feet in size.

38.    In November 1996, Linens was spun off by CVS Corporation (Melville's successor) in an initial public offering ("IPO") of 13 million shares, which raised $201.5 million (at $15.50 per share).  According to the final prospectus, just prior to the IPO, Linens operated 117 superstores and 39 smaller stores.  [Form 424, filed November 26, 1996].

39.    By the end of 2001, Linens was operating 343 superstores in the United States and Canada.  The non-linens "things" side of the business – housewares and home accessories (such as cookware, dinnerware, glassware, small appliances, candles, *etc.*) -- had grown to over 40% of sales.  The "linens" product line included home textiles such as bedding, towels, window treatments, and table linens.  Between 1994 and 2001, Linens's gross square footage increased from 2.9 million to 12.0 million.  [Form 10-K, filed March 28, 2002, at 3]   In the fourth quarter of 2001, Linens decided to improve store performance and profitability by closing 16 under-performing stores, which was accomplished by 2003.  [*Id.* at 23; Form 10-K, filed March 18, 2004, at F-5 and F-6]   Net sales per square foot fluctuated slightly thereafter, remaining fairly constant between 2001 ($168) and 2004 ($166).  By the end of 2005, the figure dropped to $156

per square foot, and never rose above that figure by the time of Linens' bankruptcy filing, principally because Linens added stores and closed few, while sales revenues declined.

**B.     The Acquisition by the Sponsors**

40.     Linens Holding Co., a Delaware corporation ("Linens Holdings" or "Linens"), together with its wholly-owned, consolidated subsidiaries, including Linens 'n Things, Inc. and Linens 'n Things Center, Inc., was an entity that was formed in connection with the acquisition of all of the common stock of Linens 'n Things, Inc. (the predecessor to Linens Holdings) for aggregate consideration of approximately $1.3 billion.

41.     In November of 2005, affiliates of Apollo Management, L.P., National Realty & Development Corp. and Silver Point Capital Fund Investments LLC (collectively, the "Sponsors") formed Linen Holdings to serve as a holding company.   On February 14, 2006, Linens Holdings acquired Linens 'n Things, Inc. when its newly formed subsidiary, Linens Merger Sub Co., merged with and into Linens 'n Things, Inc. and Linens 'n Things, Inc., as the surviving corporation, became a wholly-owned subsidiary of Linens Holdings.

42.     On November 8, 2005, Linens Merger Sub Co. and Linens Holdings entered into an Agreement and Plan of Merger with Linen 'n Things, Inc. to acquire Linens n' Things, Inc. through a merger (the "Acquisition").  Pursuant to the merger agreement, each share of common stock of Linens 'n Things, Inc. would be converted into the right to receive cash for aggregate consideration of approximately $1.3 billion.  The Acquisition was structured as a reverse subsidiary merger, and on February 14, 2006, Linens Merger Sub Co. was merged with and into Linens 'n Things, Inc. with Linens 'n Things, Inc. as the surviving corporation.

43.     Linens 'n Things, Inc. assumed by operation of law, *inter alia,* $650 million aggregate principal amount of Senior Secured Floating Rate Notes due 2014 of Linens 'n Things, Inc. and Linen 'n Things Center, Inc. (collectively the "Issuers"), issued on February 14, 2006, and the related indenture (the "Notes").

44.     Affiliates of Apollo Management, L.P., National Realty & Development Corp. and Silver Point Capital Fund Investments LLC (the "Sponsors") collectively contributed approximately $648 million as equity to Linens Merger Sub Co. immediately prior to the Acquisition.

45.     Immediately following the Acquisition, Linen 'n Things, Inc. became a wholly-owned subsidiary of Linens Holdings.  Linens Holdings is an entity that was formed in connection with the Acquisition and has no assets or liabilities other than the shares of Linens Merger Sub Co. and its rights and obligations under and in connection with the merger agreement with Linens 'n Things, Inc. and the equity commitment letters and debt financing commitment letters provided in connection with the Acquisition.

46.     As a result of the Acquisition, all of Linens 'n Things, Inc.'s issued and outstanding stock was acquired by Linens Holdings.  At such time, an investment fund associated with or designated by the Sponsors acquired approximately 99.7% of the stock of Linens Holdings through an investment vehicle (*i.e.,* Linens Investments) controlled by Apollo Management V or one of its affiliates, and DiNicola acquired the remaining 0.3% of the stock. Finally, in connection with the Acquisition, the Company also closed on a $600 million senior secured asset-based revolving credit facility (the "Credit Facility") with a consortium of lenders.

C.      **The Company's Debt**

47.     In accordance with the indenture governing the Notes, reports pursuant to

Sections 12 and 13 of the Exchange Act, and the regulations and rules promulgated thereunder

by the SEC, were furnished to the noteholders by making them available on the Company's web

site. In September 2006, the Notes were exchanged for new Notes with terms that were identical

to the original Notes except that the exchange notes were registered under the Securities Act of

1933 upon the filing of a Form S-4 and a related amendment in July 2006 and August 2006,

respectively, with the SEC.  At such time, the Company once again became subject to filing

obligations with the SEC.

48.     The Notes were fully and unconditionally guaranteed, jointly and severally, on a

senior basis by the Linens Holdings, and by each of Linens Holdings' direct and indirect

subsidiaries that guarantee the Linens Holdings' Credit Facility.  However, Linens Holdings'

Canadian subsidiaries do not guarantee the Notes.

49.     The Form 10-Q for the fiscal quarter ended September 30, 2006 filed on

November 14, 2006 (the 2006 3Q-10Q) at 47 reported that:

> ***All obligations under the Notes, and the guarantees of those obligations, are
> secured, by first priority liens,*** subject to permitted liens, ***on all of the
> Company's, the Issuers' and the subsidiary guarantors' equipment, intellectual
> rights and related general intangibles*** and the capital stock of the Issuers and
> certain of the subsidiaries.  The Notes are also secured by second-priority liens on
> the Issuers' and the subsidiary guarantors' inventory, accounts receivable, cash,
> securities and other general intangibles.

Emphasis added.

50.     The Notes were the subject of loan covenants pursuant to agreement and the Note

indenture, whereby the Company was required to provide to the Noteholders, including Levine,

the following reports pursuant to the Exchange Act and SEC rules:  "(1) all quarterly and annual

reports that would be required to be filed with the SEC on Forms 10-Q and 10-K if Linens 'n

Things, Inc. were required to file such reports; and (2) all current reports that would be required

to be filed with the SEC on Form 8-K if Linens 'n Things, Inc. were required to file such

reports."   In addition, "All such reports will be prepared in all material respects in accordance

with all of the rules and regulations applicable to such reports."  [Linens 'n Things, Inc. and

Linens 'n Things Center, Inc. Final Prospectus Filed Pursuant to SEC Rule 424B3, dated August

25, 2006 at 245 (the "Prospectus")].

51.     The Company's "Credit Facility" or "Revolver" initially had a line of $600

million and was subsequently amended in May 2007 to increase the line to $700 million, and

then replaced in its entirety with a new $700 million senior secured asset-based revolving credit

facility in October 2007.

52.     SEC rules require that financial statements filed on forms 10-K, 10-Q and 8-K be

in compliance with GAAP.  Failure to comply with the filing of financial statements in

accordance with the required SEC Rules, and thus GAAP, was an event of default under the

indenture agreement to the Notes.  Prospectus at 247.  The Credit Facility contained similar

covenants.

**D.   Management Services Agreement**

53.     Upon consummation of the Acquisition, the Company entered into a

management services agreement with control person defendants Apollo Management V, an

NRDC affiliate (NRDC Linens B LLC) and Silver Point.   Under the agreement, the Sponsors

agreed to provide to the Company certain investment banking, management, consulting, financial

planning and real estate advisory services on an ongoing basis for a fee of $2 million per year.

Under this agreement, Apollo Management V also agreed to provide to the Company certain

financial advisory and investment banking services from time to time in connection with major financial transactions that may be undertaken by it or its subsidiaries in exchange for fees customary for such services purportedly after taking into account Apollo Management V's expertise and relationships within the business and financial community.  In addition, the Company paid a transaction fee of $15 million in the aggregate (plus reimbursement of expenses) to the Sponsors for financial advisory services rendered in connection with the Acquisition.  The fee was included as part of the purchase price. These services purportedly included assisting the Company in structuring the Acquisition, taking into account tax considerations and optimal access to financing, and assisting in the negotiation of the Company's material agreements and financing arrangements in connection with the Acquisition.

### E.   Stockholders' Agreement

54.     The stockholders of the Company are Linens Investors, which is owned by the Sponsors, two executives of the Company, defendants DiNicola and non-defendant F. David Coder, Executive Vice President, Store Operations, and one other non-defendant director, George G. Golleher.   Linens Investors entered into an agreement with the Company, and each of the other stockholders entered into so-called joinder agreements to be bound by the stockholders' agreement. The stockholders' agreement sets forth certain provisions relating to the management of the Company.

### F.     The Acquisition Price and Allocation Thereof

55.     At December 31, 2006 the Company reported that the purchase price the Sponsors paid for Linens would be $1,318,658,000, which consisted of $1,295,834,000 in cash and $22,824,000 in "Transaction costs."  [2006 10-K at 34].

56.     Net assets acquired (*i.e.,* assets less liabilities) were reported as $1,064,604,000. The difference between the total purchase price and the latter figure or what is termed "Excess of cost of acquisition over net assets acquired" was equal to $254,054,000.  Under GAAP, this excess is to be allocated to identifiable assets and liabilities to bring them to "fair value."  In Linens' instance, the Company "wrote up," *inter alia,* "Definite-lived" and "Indefinite-lived intangible assets" by approximately $161,018,000 ($122,688,000 representing "trade-marks and trade names") and increased "Deferred Income Taxes," a liability, by $152,892,000.  [APB 16, SFAS 141].

57.     The foregoing, together with some smaller valuation adjustments of the same nature, had the effect allocating the remainder of the total purchase price over the fair value of identifiable net assets to "Goodwill."  Accordingly, at December 31, 2006, the defendants represented that the Goodwill of Linens was equal to $267,830,000.

G.     **Generally Accepted Accounting Principles for Impairment of Assets**

58.     Statement of Financial Accounting Standards Board ("SFAS") No. 144 requires that "a long-lived asset (or asset group) shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable." SFAS No. 144, ¶8.  As a result of events, which defendants ultimately attributed to the Company's failure (*i.e.,* the poor housing and credit markets), defendants should have assessed more frequently and\or accurately the carrying value of the Company's long-term assets, including those at its over 550 stores (primarily furniture and fixtures and leasehold improvements, as well as identifiable intangible assets).  However, as explained herein, the Company was apparently unable to perform reasonably accurate forecasts without the assistance of outside experts.

59.     SFAS No. 144, paragraph 22, provides the following events or circumstances that trigger the recoverability test requirement:

> (a) a significant decrease in the market price of a long-lived asset (asset group); (b) a significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition; (c) a significant change in . . . the business climate that could affect the value of a long-lived asset (asset group); (d) a current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group); (e) a current expectation that, *more likely than not,* a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life.

[Emphasis in original]

60.     The events and circumstances known or that should have been known to defendants throughout 2006 and 2007, and as described in paragraphs 56 (a) through (e), readily reveal that one or more of the examples cited in SFAS 144, quoted above, were in existence not later than March 27, 2007, the date of the filing of the 2006 10-K, and required defendants to reperform an accurate impairment analysis.  That impairment analysis would have led defendants, if they acted pursuant to GAAP and specifically to SFAS No. 144, to conclude that long-lived assets at least at "underperforming" Linens' stores were materially impaired.  Such impairment would have resulted in a timelier write-down of the carrying value of these assets.

61.     By reporting earnings (in this instance, reporting operating losses that were artificially low) based on artificially high carrying values for the Company's assets, defendants violated SEC Regulation S-X (17 C.F.R. §210, *et seq.*) which requires that annual and interim reports containing financial statements comply with GAAP.   The same regulation creates a presumption that financial statements that are not prepared in compliance with GAAP are misleading and inaccurate.

62.     According to the 2006 10-K filed on March 27, 2007, the Company represented that the carrying value of its "Property and equipment, net" was $612,247,000 [2006 10-K at 55] at December 31, 2005.  During 2006, the Company took $27,992,000 in impairment charges for "fixed assets" or 4.5% of the carrying value at December 31, 2005.

63.     In 2007, despite a worsening macroeconomic environment and sales declines, the Company actually decreased its fixed asset impairment charges and did not take any charges, but for the third quarter of 2007.  Then the Company reported that $16,779,000 in fixed asset impairment charges were taken, which approximated a meager 3% charge to the opening balance of fixed assets of $530,829,000. [2007 10-K at 29].

64.     Similarly, SFAS No. 142 requires impairment charges be taken for "Goodwill." Although more emphasis is placed on annual testing for goodwill impairment under SFAS No. 142, interim or more frequent impairment testing for Goodwill is required where events and circumstances (similar to those mentioned in SFAS 144) occur between annual tests that suggest that the fair value of the reporting unit or entity might have declined below its carrying value. Examples of such occurrences include an adverse change in the business climate or market, an introduction of new competition, or a loss of key personnel.   Goodwill also is required to be tested for impairment on an interim basis when it is deemed "more likely than not" that a reporting unit or significant portion of a reporting unit will be disposed of, and furthermore, when a significant asset group within a reporting unit is required to be reviewed for recoverability because of the events and circumstances triggers included in SFAS No. 144. Annual testing is required in all cases.

65.     At December 31, 2006, the Company reported Goodwill of $267,830,000 or almost 15 times the amount as reported for December 31, 2005 or $18,126,000.  At December

31, 2007, the Company reported an even higher value of Goodwill, $272,420,000.  [2007 10-K at 57].  Remarkably, the Company did not take any impairment charges for Goodwill for both 2006 and 2007.

66.     The Company engaged outside experts (Conway, Del Genio & Gries & Co. LLC ("CDG")) to "help the Company improve its liquidity and cash-flow forecasting and modeling." [Linens' response to SEC's comment letter of October 14, 2008  at 11 (the "Linens' Response")].

67.     CDG determined that Linens' forecasting models were deficient, and within weeks of the hiring of CDG, CDG's role was "expanded" to look "at available alternatives for managing liquidity, its cost structure and its real estate portfolio" to create "additional liquidity." [Linens' Response at 11].  Unfortunately, CDG was not hired until mid-March 2008.

68.     Indeed, shortly after engaging such, the Company revealed on May 2, 2008 that it was initially closing 120 stores immediately, or 22% of Linens' domestic stores, and that it could not issue required financial statements, as it was still conducting an "impairment analysis."

69.     Approximately six months later, in or about August 2008, the Company then reported that it was closing 218 stores by the end of August 2008 or approximately 36% of the 589 (including Canadian) stores open at December 31, 2007.  2007 10-K at 5.  Within only a few months, in or about October 2008, Linens closed all of its stores upon deciding to liquidate.

**H.      The Classification of the Over 500 Linens' Stores**

70.      On May 24, 2006, Linens held an "Earnings Conference Call" for the first 2006 fiscal quarter.  At the conference call, defendants made the following statement concerning the quality and number of Linens' stores, [Defendant DiNicola]: "[T]he top 101 stores have all been

identified and are being intensified with additional support to help drive the productivity in those

which are essentially the largest volume stores in the chain."

71.     At the August 16, 2006 conference call the following statements were made

concerning the classification of Linens' stores, [Defendant DiNicola]:

> By the end of this month, I will have been to, with our folks, all of the top 100
> stores.  These top 100 stores are directed by 10 regional managers. . .  Those 10
> regional managers are responsible for approximately $300 million worth of
> business each. . . [W]e would expect to find as many of the 550 stores that we
> have reflecting the approach that we're taking in the top 100 stores. . .

[Tr. at 6]

                \*            \*           \*

> Karen Miller [analyst]: [B]ob since you've been there about six months, you've
> probably had a chance to look at a large number of stores and you talked about the
> top 100 stores, and I noted the low 25 to 30 stores, are you comfortable with
> where the store base is now, or do you think that you might want to close some
> stores?

> [Defendant] DiNicola:  There are stores that we will close on an ongoing basis as
> the leases come up, and we evaluate what we should do . . .  We will close the
> usual number of stores, which is single digits.

                \*            \*           \*

> [Defendant] DiNicola:  [A]nd there are 25 or 30 stores in that category, all of
> them --- most of the stores we would probably like to keep and should probably
> be doing better than they are today, but require attention to get them to a level, off
> of what I would call the endangered list, so that they can be at the appropriate
> level of productivity. . .

[Tr. at 9]

> Vascar Doda [Analyst, Calyon Securities]:  . . . Sometime ago, I think it's
> probably in the prospectus for the roadshow, ***you mentioned that the[r]e were
> roughly about 170 stores that were opened since the beginning of 2003 that
> were underperforming in terms of sales and EBITDA compared to the rest of
> the stores.***  And I was wondering if you could give us some idea as to what kind
> of progress has been made since the financing and bridging the gap between those
> two kind of stores?

[Defendant] Rowen:  Talking specifically about stores that go back several years and their contribution overall versus the rest of the portfolio?

Vascar Doda:  Exactly.  I think the stores that were opened since the beginning of 2003, I think they were identified as a problem area to the Company as they were lagging behind the remaining stores in terms of both sales and EBITDA.

*     *     *

[Defendant] DiNicola:  Let me make a comment on that issue further.  All the stores are – all the stores are entitled to more productivity.  It's not a question of 170 stores named in a prospectus or portfolio or commentary from 2003. All the stores in the chain need to be more productive.

[T]here are 100 top stores that we're focusing on that do 30% of the business. And as I mentioned in one of the previous questions, ***there are 25 or 30 stores that are at the bottom end and everybody else is in the middle.***

[Tr. at 10 (Emphasis added)]

72. The Company filed on Form 424B3 a Prospectus dated August 25, 2006, where it also discussed the profitability and number of stores of the Company:

As of April 1, 2006, ***we operate 549 stores, 174 of which were opened since the beginning of 2003. These 174 stores have not yet reached sales and store-level EBITDA consistent with our stores that were opened before 2003.*** Store-level EBITDA represents operating profit derived for each store, before depreciation for all fixed assets located at each store and amortization, where operating profit is based on each store's actual sales less direct expenses excluding an allocation of overhead. Historically, new stores take 4 to 5 years to reach the financial performance of a mature store. Accordingly, we expect our recently opened stores to generate improved financial performance and contribute meaningfully to our overall net sales and store-level EBITDA as they mature over the next few years.

[Prospectus at 8 (Emphasis added)]

73. On November 14, 2006, at the earnings conference call, the following statements also were made concerning the classification of Linens' stores:

[Defendant] DiNicola: The top 100 stores, which do anywhere in the range of 30 to 35% of the business let's say, are doing exactly what we expected them to do in terms of their turn in productivity.  Where we're pleasantly surprised is in the –

23

the C stores – the C stores, you know the bottom – we have 550, so say the bottom 150 or 200 stores or whatever.  . .

                    *                    *                    *

Now, there is another group of stores we'd call affectionately the endangered species group which are stores, there's not that many of them, they we constantly look at and say are these stores – from a long-term standpoint – are these stores – are they fixable? What are we going to do with the lease when the lease is up? Do we have to change out. So on and so forth.

[Tr. at 8]

74.    Thus, the Linens' stores were classified into categories "A," the top 100 or 101 performing stores in terms of "sales" and "EBITDA;" "C," the approximate lower 175 stores, including the 25-30 "endangered species" stores, and the "B" stores, every store in between, or approximately 175 stores [*i.e.,* 550 total stores – 100 (A stores) – 175 (C stores) = 175 (B stores)]; or, in percentage terms, 18% A, 31% B, and 31% C stores.

75.    By no later than October 26, 2007, the number of C stores increased to 305, representing approximately 52% of the total store base of 580 stores.

**I.     Vendor Tightening of Credit Terms During 2007; Loss of Credit Insurance**

76.    Throughout both 2006 and 2007 defendants stated in response to analysts' inquires that Linens' vendors were not tightening credit terms.  As is clear from the following, vendors indeed were tightening terms during both 2006 and increasingly so in 2007:

| | | Comparative DPO - textbook calculation | | | | | |
|---|---|---|---|---|---|---|---|
| | | **2005** | **2006** | **2007** | **'07 change from '06** | **'07 change from avg '05&'06** | |
| | **Q1** | 55.7 | 55.2 | 43.8 | -20.76% | -21.11% | |
| | **Q2** | 59.6 | 53.0 | 45.8 | -13.63% | -18.71% | |
| | **Q3** | 57.8 | 56.0 | 45.9 | -17.98% | -19.29% | |
| | **Q4** | 50.4 | 58.6 | 35.3 | -39.78% | -35.28% | |

| | | Comparative DPO - shortcut calculation | | | | | |
|---|---|---|---|---|---|---|---|
| | | **2005** | **2006** | **2007** | **'07 change from '06** | **'07 change from avg '05&'06** | |
| | **Q1** | 64.2 | 61.3 | 48.2 | -21.29% | -23.11% | |
| analyst: | **Q2** | 65.5 | 56.9 | 49.6 | -12.77% | -18.94% | |
| | **Q3** | 67.8 | 76.8 | 59.2 | -22.88% | -18.06% | |
| | **Q4** | 43.5 | 38.6 | 25.3 | -34.57% | -38.46% | |

77.     Thus, since not later than the first fiscal quarter of 2006, the days' payables outstanding metric significantly declined, signaling a tightening of credit terms by vendors. Notwithstanding, as explained below, each time analysts inquired as to the above, defendants misleadingly reported that the decline for a particular quarter was solely due to "timing differences," or other innocent explanations, while maintaining that "vendor relations are good."[2]

78.     Coincident with the shortened terms, Linens increased its line of credit, as explained in the May 15, 2007 conference call by $100 million.  *Id.* at 3.

79.     As explained a year later by a rating agency:  "[F]itch is concerned some vendors have either stopped or decreased the amount of merchandise to be shipped to [Linens].  This would hinder [Linens'] sales and cash flow generation" and reduce the borrowing base for the revolver.  [Bloomberg, April 9, 2008: "Fitch Ratings has downgraded its ratings on Linens 'n Things, Inc."].

---

[2] Method sources:  Textbook calculation = Palepu, K.G. and Healy, P. M., Business Analysis and Valuation: Using Financial Statements (South-Western College, 4th ed. 2007);  Shortcut = analyst at 2007 2Q conference call.

### 2.    Linens Loses its Credit Insurance Carrier, CIT

80.    Also, not later than in or about the fourth quarter of 2007, Linens was in jeopardy of losing its credit insurance with CIT Group/Commercial Services, Inc. ("CIT").  In or about early or mid-January 2008, Linens lost its credit insurance, and thus was unable to continue its normal vendor financing arrangements.  The vendor's complaint read, in pertinent part, as follows:

> [A]s of January 18, 2008, LNT's solvency and continued ability to pay has come into question as a result of changes in its credit insurance carriers, reductions in its credit insurance limits and ultimately being dropped by its credit insurance carrier, CIT Group/Commercial Services, Inc. ("CIT").  As a result of being dropped by CIT on January 18, 2008, LNT no longer has credit insurance, a requirement for doing business with Dyson.

*Dyson, Inc. v. Linens 'N Things,* 08-cv-2068 (N.D. Ill. Apr. 11, 2008, docket No. 1 (complaint at pars. 9, 10).

81.    Dyson's initial complaint was filed in the Circuit Court of Cook County, Illinois on March 11, 2008, and removed by Linens to federal district court on April 11, 2008 (the "Dyson-Illinois Action").

82.    The Dyson-Illinois Action was stayed by the court under the bankruptcy stay, but a related action was filed by LNT Merchandising against Dyson in this Court on April 28, 2008, the same day that Linens had moved to dismiss the Dyson-Illinois Action. [Defendant Dyson, Inc.'s Memorandum of Law in Support of Motion to Dismiss Plaintiff's Complaint, Dkt. No. 08-cv-02883-SRC-MAS ("Dyson's Opening Brief") (the "LNT-Dyson NJ Action")].

83.    In the LNT-Dyson NJ Action, Dyson submitted the complaint in the Dyson-Illinois Action and summarized in its moving brief the above quoted allegation as follows: "As also alleged in that action, as of January 18, 2008, Linens 'N Things was dropped by its credit

insurance carrier, CIT, and no longer had credit insurance – which was a requirement for doing business with Dyson." Dyson Opening Brief at 6 (citing, the declaration of one of Dyson's counsel, Lauri A. Mazzuchetti, Exhibit A, ¶¶ 9-10).

84. LNT-Merchandising filed an opposition to Dyson's motion, as well as a surreply brief and declarations in connection therewith, and in none of those papers addressed Dyson's allegation that Linens no longer had credit insurance with CIT since January 18, 2008.

**J.      Overly Optimistic Statements in Light of Dismal Prospects**

**1.      Disregard of the Deteriorating Macroeconomic Environment**

85. Since acquiring Linens, defendants presented a cavalier, but reassuring attitude toward macroeconomic factors that could adversely affect the carrying value of the Company's assets, among other things. For example, at the May 24, 2006 conference call, the following discussion took place between defendant DiNicola and an analyst concerning the same:

> Karen Miller [analyst]: [O]ne last question. Are you seeing any slowdown in consumer spending? We're getting some soft housing figures, and certainly higher gas prices are eating into consumers' pockets. Have you seen any change in spending patterns?
>
> [Defendant] DiNicola: [W]e have not experienced any dramatic shift in the way consumers have been reacting that we can tell as we know.
>
> *                    *                    *
>
> [W]e're not going to be overly concerned or distracted by anything else that may be happening outside of our operation.

[Tr. at 10]

86. And at the August 16, 2006 earnings conference call, another exchange took place concerning the macroeconomic environment between defendants and an analyst:

Brian Nagel [analyst]:  Turning to the macro environment, how would you kind of read the health of your core consumer at this point given higher gas prices and other macro type concerns out there?

[Defendant] DiNicola:  I wish it was better.

Brian Nagel:  Do you see any impact – have you been able to look at your business trying to see any specific impact on your consumer?

[Defendant] DiNicola:  The truth is that we are so busy focusing internally on the things that we can control, we have very little time to take into vast account what is occurring beyond our control.

[Tr. at 15]

87.     At the November 14, 2006 earnings conference call, defendants discussed with

analysts certain macroeconomic conditions that they "don't spend a lot of time worrying about:"

Karru Martinson [analyst:] And if I could just take a step back and look at the macro picture, how do you feel that your sales are correlated with housing markets going forward here?

[Defendant] DiNicola:  That's hard for us to judge.  We honestly don't spend a lot of time worrying about that mainly because there's nothing we can do about it . . .

Tr. at 4.

88.     Later during the same conference call the following exchange took place

concerning automobile fuel prices:

Jeff Koblarz [analyst:]  Okay, and lastly, can you comment at all if your comps got better as the quarter went on with gasoline prices dropping down to the lower $2 level.  Do you see a correlation or causality?

[Defendant] DiNicola:  I don't necessarily see a correlation between gas prices and shopping. Compare comp levels on a month-to-month basis.  I think those kinds of things require a much more long-term curve to them and we would have to all sit back [and] watch this over a much longer timeframe.

89.     Also at the November 14, 2006 earnings conference call, defendant DiNicola now indicated that there may be greater than 174 "C" stores, as reported upon in the August 25, 2006 Prospectus.  *See* Tr. at 8 ("[T]he C stores – the C stores, you know the bottom – we have 550, so say the bottom 150 or 200 stores or whatever").

90.     Finally, defendants stated that "We do anticipate at this point in time we will pay down the revolver at some point by the end of the year."   Tr. at 11 [Defendant Rowan]

91.     The November 14, 2006 third quarter 10-Q for the quarter ended September 30, 2006 reported that the utilized portion of the $600 million revolving credit arrangement ("the Credit Facility") was $225.9 million. In addition, the Company reported $193.7 million of letters of credit outstanding as of the same date issued under the Credit Facility.   2006 3Q-10Q at 48.

92.     The 2006 3Q-10Q reported that amounts drawn under the Credit Facility were secured by first priority liens on (1) "inventory, accounts receivables, cash, securities and other general intangibles; and (2) a second-priority security interest in equipment, intellectual property rights and related general intangibles and all of the capital stock of the Issuers and the capital stock of certain subsidiaries." *Id.*

**2.     Sales Per Square Foot Never Rise Above 2005 Figures in 2006**

93.     As the 2006 10-K stated, "Under the leadership of Robert J. DiNicola . . . the Company intends to focus on growing its sales per square foot . . . , which the Company believes is key to improving its profitability and cash flow." *Id.* at 6. At the August 16, 2006 conference call, defendant DiNicola stated that "on average, all the stores produce about $150 a square foot." [Tr. at 11].  During both 2006 and 2007, DiNicola stated that the target sales per square foot was $185.

3.      Net Sales Only Increase Because of the Opening of New Stores;
        Same Store Sales Generally Decline

94.     Comparable store sales decreased 3.7% for the fiscal quarter ended April 1, 2006,
while net sales for the same period increased by 3.8% due to "new store openings since last
year." [2006 1Q-10Q at 36]. For the fiscal quarter ended July 1, 2006, comparable store sales
increased a paltry 0.2%, while net sales increased for the same period by 6.7%, again primarily
because of "the opening of new stores . . ." [2006 2Q-10Q at 39].[3]

95.     Comparable store sales for the fiscal quarter ended September 30, 2006 increased
only 0.2%, while net sales for the same period increased 4.6%, once again because of the
"opening of new stores." [2006 3Q-10Q at 45]. For the fourth quarter of 2006, comparable store
sales declined modestly by 0.2% and net sales for the same period increased 3.9% from the prior
comparative period. [March 15, 2007 earnings call tr. at 3]. For the fiscal year 2006,
comparable store sales fell by 0.7%, while net sales increased by 4.6% over 2005, again because
of the opening of new stores. *Id.*

96.     However, even more striking was the fact that the Net Loss for the period of time
since defendants managed Linens (February 14, 2006 to December 30, 2006) was $106.6
million. If the "stub period" from January 1, 2006 through February 13, 2006 was included, this
figure increases by $47.9 million yielding a Net Loss of $154.5 million for the 2006 fiscal year.
[2006 10-K at 54]. These figures compare to Net Income of $36 million for fiscal 2005 and
$60.5 million for fiscal 2005. *Id.*

---

[3] "Same-store sales" has been defined as "a business term which refers to the revenue generated by a retail chain's
existing outlets over a certain period of time (often a fiscal quarter or a particular shopping season), compared to an
identical period in the past, usually in the previous year. By comparing sales data from existing outlets (that is, by
excluding new outlets), the comparison is like-to-like, and avoids comparing data that are fundamentally
incomparable." Wikipedia, available at http://en.wikipedia.org/wiki/Same-store_sales. (references omitted).

97.     The year 2007 fared even worse.   For the 2007 fiscal first quarter same store sales were down 5.2% from 2006 and total sales were down 3.6%.  [May 15, 2007 conference call, tr. at 2].   Defendants reported a 7.3% decline in same store sales for the 2007 second fiscal quarter, while total sales declined 3.6%.   [Aug. 14, 2007 conference call, tr. at 3].

98.     Defendants reported the following sales measures for the 2007 fiscal third quarter: same store sales were down 1.4% compared to the 2006 fiscal third quarter, while total sales were up a modest 1.3% for the 2007 fiscal third quarter compared to the 2006 fiscal third quarter. [November 13, 2007 conference call, tr. at 2].

99.     For the 2007 fourth quarter, comparable store sales were down 1.0%, while total sales for the same period gained a paltry 0.6% over total 2006 fiscal fourth quarter sales.  [March 20, 2008 conference call, tr. at 3].

100.    For the year 2007, comparable store sales were down 3.4% compared to 2006 [*id.*], and total net sales were down 0.9%.  [2007 10-K at 37].

**4.      EBITDA is Comparatively Worse than in 2005 and Declines**

101.    The Company defined EBITDA or "Earnings Before Interest, Taxes, Depreciation and Amortization," as follows:  "EBITDA represents net income (loss) before provision (benefit) for income taxes, interest expense, net[;] and depreciation and amortization. Adjusted EBITDA represents EBITDA further adjusted to exclude non-cash and unusual items."   To arrive at Adjusted EBITDA, impairment charges are added back to EBITDA.

102.    The Company also represented that "Management uses EBITDA and Adjusted EBITDA as additional tools to assess the Company's operating performance.  Management considers EBITDA and Adjusted EBITDA to be useful measures in highlighting trends in the

Company's business and in analyzing the profitability of similar enterprises.  It is also used as a measurement for the calculation of management incentive compensation."  [2006 10-K at 30]

103.    Defendants stated that "***Management believes that EBITDA and Adjusted EBITDA are effective,*** when used in conjunction with net income, ***in evaluating asset performance*** and differentiating efficient operators in the industry."  *Id.* [Emphasis added].

104.    In connection with its quarterly and annual SEC reports and conference calls, the Company reported on EBITDA as a metric to gauge performance and means to comply with certain debt covenants, and made occasional reference to classifying Linens stores' "cash flow" generated based upon "EBITDA" or revenues.  These stores were classified as "A," "best performers," "C" stores were considered "underperformers," and "B" stores were somewhere in between.

105.     The Company also represented that "Store-level EBITDA represents operating profit derived for each store, before depreciation for all fixed assets located at each store and amortization, where operating profit is based on each store's actual sales less direct expenses excluding an allocation of overhead."  [2006 10-K at 6-7]

106.    For the first fiscal quarter of 2006, Linens "generated negative EBITDA of [$]61.1 million compared to positive EBITDA of 15.4 million in the first quarter of 2005." [Defendant Rowan, May 24, 2005 conference call, tr. at 2].

107.    For the 2006 second fiscal quarter, Linens "generated negative EBITDA of [$]10.2 million compared to positive EBITDA of 13.7 million in the second quarter of 2005." [Defendant Rowan, August 16, 2006 conference call, tr. at 2].

108.    For the fiscal third quarter of 2006, Linens generated "EBITDA of a positive $15.2 million compared to a positive EBITDA of $25.3 million in the third quarter of 2005." [Defendant Rowan, November 14, 2006 conference call, tr. at 2].

109.    Finally, for the fiscal fourth quarter of 2006, Linens reported EBITDA of $19.6 million compared to EBITDA of $97.6 million in the fourth quarter of 2005.  [March 15, 2007 earnings release at 11].  For the fiscal year ended 2006, EBITDA was a negative $36.5 million compared to positive EBITDA of almost five times that amount for fiscal 2005 or $152.1 million.  *Id.*

110.    EBITDA, however, is not a GAAP measurement.  Regulation G, SEC Exchange Act Release, 34-47226 (Jan. 22, 2003).

**5.      Linens Continues to Open Stores and Declines to Even Consider Closing Any Until the Stores' Respective Leases Are Up for Renewal**

111.    Despite the dismal operating performance, cash outflows, and poor macro-economic conditions, Linens continued to open stores throughout 2006 and 2007 and not consider closing any until the respective lease terms were up.   Linens reported in its annual reports filed on Form 10-K the number of stores it maintained in each state.  [*Id.,* at 25-16].  As can be determined from the list, a large percentage of the stores were in states where there existed a known "housing bubble." For example, of the 536 United States stores open at the end of 2006, 63 were in California and 45 were in Florida or almost 20% of the total number of stores.[4]   In addition, original lease terms range from 10 to 20 years, with renewals ranging from five to 20 years. [2006 10-K at 24].   Notwithstanding, the Company also stated that "[t]he

---

[4] The there were an additional 35 Canadian stores, bringing the total number of stores to 571 at December 30, 2006. [2006 10-K at 24 – 26].

Company believes that none of its leases is individually material to it." *Id.*  Linens also stated that 11 leases would be expiring "in fiscal 2007 or 2008."  [2006 10-K at 26].

112.    For the fiscal year ended 2006, the Company opened 31 stores and closed only two, bringing the total number of stores open to 571.   For 2007, the Company opened 18 new stores *and closed no stores* and forecasted the opening of 10 new stores for 2008.  [2007 10-K at 5, 39].

113.    As of December 30, 2007, the Company reported it now had 589 stores open, 104 of which had been opened since the beginning of 2005.  *Id.* at 5.

**6.    Defendants are on Notice of Linens' Deficient Forecasting Practices**

114.    Defendants were on notice that Linens' sales forecasting was woefully deficient as early as the first fiscal quarter of 2006.

115.    For example, at the May 24, 2006 conference call concerning the 2006 fiscal first quarter earnings, Alexis Gold, an analyst at UBS stated, "Just a few questions. When we look at the first quarter numbers, I think similar to what you were saying, they were lower than we expected."  [Tr. at 5]

116.    Defendants also missed forecasts in 2007.   [*See e.g.,* Q1 2007 Earnings Conference Call at 1 (defendant DiNicola: "Clearly the financial results for the quarter were disappointing . . .")].

117.    As detailed below, however, defendants followed reports of poor results with reassuring statements, which defendants knew or were negligent in not knowing were without a reasonable basis.  For example, in the same Q1 2007 conference call, defendant Rowan made the following comments:  "While we were disappointed with our first quarter financial results, we

continue to pursue and execute strategies that are designed to improve sales productivity and overall profitability." *Id.,* tr. at 3.

### 7. The Company's woefully deficient budgeting metrics

118.    However, not until well after Linens filed its bankruptcy petition, were the deficiencies in defendants' forecasting methodology revealed.   In a letter dated September 15, 2008 from the SEC addressed to defendant Rowan, the SEC wished to know the following in light of several positive statements concerning financial performance contained in the 2007 10-K and accompanying financial statements, as contrasted with the Company's filing "for bankruptcy under Chapter 11" only weeks later:

> The [positive disclosures] are included in your December 29, 2007 Form 10-K filed on March 20, 2008.  We also note that your audit report and disclosures do not provide a discussion of any doubt as to the Company's ability to continue as a going concern.  In light of the fact that the company filed for bankruptcy under Chapter 11 as of May 2, 2008, please tell us why there is no discussion of the company's liquidity problems in the 10-K.

119.    A "going-concern" has been defined as "an existing solvent business, which is being conducted in the usual and ordinary way for which it was organized."  The value attributed to a going concern has been defined as: "The value of a firm, assuming that the firm's organization and assets remain intact and are used to generate future income and cash flows." BLACK'S LAW DICTIONARY at 691 (6th Ed. 1990).

120.    Unless informed otherwise, readers of GAAP-prepared financial statements presume the entity is a going concern.  *E.g.,* SEC No Action Letter, *Firestone Tire & Rubber Co.*, 1978 WL 12298, at *6 & n. 4 (Dec. 20, 1978) ("The going concern assumption has been recognized in the accounting profession as a 'basic feature' of financial reporting.") (citing APB No. 4 (1970):

A basic assumption underlying the preparation of financial statements in most circumstances is that the Company is a going concern and will not have to liquidate.   Unless the statements indicate otherwise, the reader is entitled to assume that the statements are those of a going concern, and that the amounts at which the assets are carried do not represent liquidation values, but rather amounts that will have to be allocated to future years.

 [*Firestone Tire & Rubber,* 1978 WL 12298, at *6 (quoting Rappaport, SEC ACCOUNTING

PRACTICE AND PROCEDURE, at 25-26 (3rd ed. 1972); AICPA, ACCOUNTING RESEARCH BULLETIN,

No. 43, Ch.3A ¶2 (same).

121.    The referenced audit report and professional standards state that the financial

statements are the responsibility of management.  AU §333A, *Management Representations.*

Many of the red flags to determine whether a company is a going concern are similar to those

events that trigger impairment analysis under SFAS Nos. 144, ¶22 ("a current-period operating

or cash flow loss combined with history of operating or cash flow losses or a projection or

forecast that demonstrates continuing losses . . .") and 142; SAS No. 59 ("recurring operating

losses, working capital deficiencies, negative cash flows from operating activities, and adverse

key financial ratios").

122.    The Company responded to the SEC with a letter dated October 14, 2008, the

"Linens' Response."   The Linens' Response revealed that the Company's forecasted same store

sales figures for 2008 were much more optimistic than the actual figures reported for the

immediately preceding three quarters' average decline in same store sales revenues for 2007.

[Linens' Response at 7 – 8].

123.    Specifically, Linens' Response states the following:

[The budget as of March 20, 2008] was primarily based on a revised budget for fiscal 2008, which was more conservative than the original budget that had been reviewed and approved by the Board of Directors in October 2007. ***Company management initially developed the original budget in the ordinary course of***

> *business* . . . It then revised the budget in January and February 2008 in order to assess the Company's liquidity for 2008 with more conservative sales assumptions and projections.
>
> Because the revised budget was based on more conservative projections and assumptions, the Company management believed that it was reasonable and achievable.  This belief was also based, in part, on the progress of the Company's turnaround plan [n.2].  Moreover, the budget assumed that there would be no significant changes in the external environment outside of the Company's control.  Also, at the time, the Company management believed that the conservative sales assumptions used in the revised budget were prudent given the sluggish economy and the challenging retail environment.
>
> The more conservative revised 2008 budget took into account the historical sales information from January and February 2008 ***and assumed a 4% decline in comparable store sales for the full year.  This sales assumption reflected lower comparable store sales for fiscal 2007, which were negative 3.4%.***  As a result, the level of comparable store sales assumed in the revised fiscal 2008 budget was a combined 7.3% below [comparable] sales levels in 2006.
>
> Using the revised 2008 budget, the Company projected its cash flow and liquidity in fiscal 2008 for evaluation purposes. . .

[Linens' Response at 7 (Emphasis added)].

124.   Immediately apparent from the above is that the 2008 budget prepared in October 2007 and approved by the board "in the ordinary course of business," reflected a 2008 same store sales decline of less than 4%.  This figure is well below the materially negative same store sales figures for the first two fiscal quarters of 2007 of 5.2%, 7.3%, respectively.  The negative same store sales figure for the 2007 third fiscal quarter was 1.4%.  Accordingly, even taking a straightforward average of the three figures (*i.e.,* (5.2%, 7.3% + 1.4%) ÷ 3 = 4.63%), defendants' 2008 forecast was glaringly and unrealistically inflated in October 2007.

125.   The "revised" 2008 forecast at a negative 4% fares no better and ignored again average same store sales metrics and the continuing macroeconomic headwinds facing the Company and its industry.  Although, same store sales came in at a negative 3.4% for all of

2007, same store sales trends clearly were headed downward in 2007 as compared to 2006 and continuing their decline in the first quarter of 2008 (*i.e.,* negative 5.7%):

| | Same Store Sales (Increase (Decrease)) | | | | |
|---|---|---|---|---|---|
| Fiscal Year | 1Q | 2Q | 3Q | 4Q | Annual |
| 2006 | (3.7%) | 0.2% | 0.2% | (0.2%) | (0.7%) |
| 2007 | (5.2%) | (7.3%) | (1.4%) | (1.0%) | (3.4%) |
| 2008 | (5.7%) | N\A | N\A | N\A | (4.0% E) |

126.     Thus, given the above noticeably negative same store sales trends in 2007 together with the other factors defendants knew or were negligent in not knowing, as alleged herein[5] an increase from negative 3.4% actual negative same store sales for 2007 to a 4% forecasted negative same store sales for 2008, clearly was unreasonable.

127.     The 2007 forecast was unreasonable as well.  For the 2007 forecast, defendants apparently did not adequately account for the flat and downward momentum in comparable sales revenues in 2006 and the dismal 2007 first fiscal quarter.

128.     The gloomy 2007 first quarter results reflected same store sales declines of 5.2% and total sales down 3.6%.  As defendant DiNicola reported at the May 15, 2007 earnings call, the Company knew or was negligent in not knowing that the 2007 forecast was much too optimistic: "Clearly the financial results for the quarter were disappointing . . . Our January business was weak, our February business was relatively strong, but our March [2007] results were below our expectations." (Tr. at 1)].

---

[5] Such other facts include the material increase in the number of "C" stores, vendor tightening of credit, which would lead to even less sales, and the admission that defendants had not considered sufficiently macroeconomic events such as the failure of Bear Stearns & Co. on March 14, 2008 in the Linens' Response, a week before the filing of the 2007 10-K on March 20, 2008.  *See* ¶¶76-7,225,260,271.

129.    Finally, 2006 forecasting was no better.  Annual same store sales came in at a negative 5.2% for 2005 with 2005 fourth quarter same store sales declining by 2.2%. Although same store sales figures improved in 2006, defendants apparently again did not adequately consider the extremely negative trends in 2005 and the first quarter of 2006, which reported same store sales declines of 3.7%.

130.    As early as July 2005, experts were warning of the severe implications to the "housing bubble."  *E.g.,* D. Baker, "The Housing Bubble Fact Sheet," Center for Economic and Policy Research (Issue Brief, July 2005) at 3, 5 ("The collapse of the housing bubble will throw the economy into a recession, and quite likely a severe recession. . . with supply persistently outstripping demand, it is only a matter of time before housing prices eventually adjust.").  And the decline started no later than 2006.  E.g., D. Baker, *The Housing Bubble and the Financial Crisis,* REAL-WORLD ECONOMICS REVIEW, Issue No. 46 at 79 (Center for Economic and Policy Research, USA, 2008) ("The bubble began to unravel after house prices peaked and began to turn down in the middle of 2006.  This led to rapid rises in default rates, especially in the subprime market."); Wkipedia, THE UNITED STATES HOUSING BUBBLE, ("At the National level, housing prices peaked in early 2005, started to decline in 2006 . . .), available at http://en.wikipedia.org/wiki/United_States_housing_bubble,  *last visited,* September 16, 2009.

131.    Thus, defendants, not later than the filing of the 2006 10-K, knew or were negligent in not knowing that the 2007 forecasts were much too optimistic given the above, and the increasing headwinds from negative trends in the housing and credit markets.

132.    A "going concern statement" informs readers that there "is substantial doubt that [the Company] will be a going concern in a year . . ." AU §341.06.  The 2006 10-K contained no "going concern" discussion in the financial statements contained therein, and readers of the

financials were entitled to assume that the Company was a going concern, as explained further below.  However, defendants themselves confirmed that the Company was insolvent no later than within six to nine months of the issuance of the 2006 10-K, and within one year of the close of the 2007 fiscal year.

133.    For instance, an April 16, 2008 NEW YORK POST article reported that DiNicola's "January [2008] meeting notes" with defendant Apollo indicated that defendant DiNicola described ***Linens' situation as "dire for a while,"*** and under the heading "Cash Flow," he wrote, "No Volume = No Cash – Can't Pay Bills," adding that the Company must "stop reliance on low margin sales." The article also stated that "Insiders say a planned Chapter 11 filing is expected to close laggard stores, but protect the company from liquidation."

134.    Notwithstanding, the financial statements contained in the 2006 10-K (filed on March 27, 2007) failed to contain "a discussion of any doubt as to the company's ability to continue as a going concern in the notes to the Company's financial statements."  Defendants also had a duty to correct or update the 2006 10-K for information coming to their attention that was available to them at the time of filing, but which they had overlooked, such as the dismal reports coming in concerning the 2007 first quarter results described herein.

135.    Defendants also filed an amended 2006 10-K on September 28, 2007, which was signed by defendant Rowan.  However, defendants did not take that opportunity, as well, to update or correct the 2006 10-K for faulty sales forecasting employed prior to the filing of the 2006 10-K on March 27, 2007.

**K.      Linens Information Systems**

136.    In the Prospectus and other filings, Linens described its management information systems as follows:

We continually evaluate and upgrade our management information systems to enhance the quantity, quality and timeliness of information available to management. We believe our management information systems have fully integrated our stores, headquarters and distribution process. Over the last several years, we have made significant investments in technology to improve guest service such as Internet and online bridal and gift registry tools. We operate an IBM AS/400 management information system that integrates all major aspects of our business, including sales, distribution, purchasing, inventory control, merchandise planning and replenishment and financial systems. Information obtained from management information systems results in automatic inventory replenishment in response to specific requirements of each store, thereby improving in-stock positions and enhancing guest service. We also utilize hand-held scanners with inventory status and price look-up capabilities, which allow our sales associates to remain accessible to guests on the selling floor.

[Prospectus at 138].

137.     Linens also stated to Levine representatives at an October 26, 2007 meeting that Linens sent "weekly flash reports to Apollo," while Linens' management received "daily store information" on the "AS 400 IS system."

138.     However, at least with respect to Apollo during a November 13, 2007 conference call defendant DiNicola stated that he "talk[s] to them everyday," in response to a question about whether "Apollo is active in the business[?]."  [Tr. 16]

**MISREPRESENTATIONS AND OMISSIONS**

139.     On March 16, 2007, defendants caused Linens to file on Form 8-K, an earnings release for the fourth quarter and year end 2006, dated March 15, 2007 (the "2006 8-K4Q").  The 2006 8-K4Q was signed by defendant Rowan.   The earnings release attached thereto reported, *inter alia,* that Linens had $956.8 million in sales for the fourth quarter of 2006, a 3.9% increase over the same quarter in 2005.  It was reported that the increase in sales was due to "the opening of new store locations, partially offset by a decrease in comparable store sales for the quarter of 0.2%." The release also reported that the net loss for the thirteen weeks ending December 30, 2006 was $22.5 million and the operating loss was $14.7 million for the same period.  The

41

Company also reported in the release that net cash used in operating activities for the period January 1, 2006 through December 30, 2006 was approximately $60 million.[6] The Company reported negative EBITDA (before "adjustments") for the fiscal year ended December 30, 2006 of $36.5 million.  [March 15, 2007 release at 11].

140.    Finally in the 2006 8-K4Q, the Company reported Property and equipment, net of $530,829,000; Identifiable intangible assets, net of $150,044,000; and Goodwill of $267,830,000 and combined "impairment" charges for these "long-lived assets" of $31,111,000.   The bulk of these charges were taken in the fourth quarter of 2006.

141.    Because of the faulty forecasting models employed by Linens, defendants' impairment analysis and charges (or lack thereof) were deficient and resulted in false and misleading inflation of the carrying values of property and equipment, identifiable intangible assets and goodwill, which dramatically overstated the value of the Company.

142.    On March 15, 2007, defendants Rowan and DiNicola conducted a conference call with analysts and others concerning the fourth quarter and year-end 2006 results and financial condition.   At the conference call, defendants were upbeat and made statements to the effect that they had or were making progress in "turning the business around here at LNT."  Tr. at 1.

> [Defendant] DiNicola:  [W]e needed to overcome all of that and fix the business while not creating any new land mines going forward, and that's pretty much what we did last year. Our team of veteran Linen 'n Things players along with a handful of newcomers worked extremely well together to begin to put the business back on track and they accomplished an awful lot in '06 operationally in a very short span of time.
>
> Probably most significantly, they were able to [stem] the loss of market share that Linens 'n Things had been experiencing for quite a while.  The team was able to achieve essentially flat comparable sales for the second, third and fourth quarters

---

[6] This is arrived at by adding the cash flow generated from February 14 to December 30, 2006 ($2.2 million) and subtracting it from the cash flow used between January 1, 2006 through February 13, 2006 ($62 million). 2006 8-K4Q at Exhibit 99.1, page 7.

and this, if you'll recall, was a huge swing from prior years.  More importantly, our comp sales increased from 3.4% during the holiday shopping period which was from Black Friday to the end of the year.

*     *     *

But having said that, we are on track with our three-phase plan . . .

[Tr. at 1-2].

143.     Defendants knew or were negligent in not knowing that the immediately preceding statements were materially false and misleading when made, as Linens' forecasting model was so deficient and unable to predict with reasonable accuracy financial results and cash flows that within a year defendants hired CDG to "improve its liquidity and cash-flow forecasting and modeling," and assist in "managing liquidity, its cost structure and its real estate portfolio." [Linens' Response at 11].   Further, at the time defendants were making the above statements (*i.e.,* March 15, 2007),  defendants knew or were negligent in not knowing that Linens was going to significantly miss expectations for the first fiscal quarter of 2007, as well.

144.     At the same conference call, defendant Rowan addressed questions concerning store openings and closings.

Alexis Gold [analyst:] [A]re there actually any stores that you've targeted for closures this year?  I know you talked about 20 store openings but any potential store closures and any losses at those store closures and any losses at those stores as well?

[Defendant] Rowan:  That's correct Bob.  At this point, Alex, there are no stores currently planned to close in 2007, though we do have a customary process of reviewing our real estate in an ongoing basis.

[Tr. at 5].

145.     The foregoing response by defendant Rowan was false and misleading when made as defendants previously reported that they only reviewed real estate for closures when the respective store leases were up.

43

146.     Further, defendants either could not or just simply refused to provide analysts with "the number of negative EBITDA stores at this point." Tr. at 8. Similarly, defendants either were unable to or simply refused to provide an estimate of whether "free cash flow" was forecasted to be positive in 2007. [Tr. at 13].

147.     Defendants were then asked about why the Credit Facility was not drawn down to zero by year end 2006 as anticipated. The Credit Facility balance was reported to be at $37.8 million at December 30, 2006. [2006 10-K at 76 (n. 9 to financials)].

> Grant Jordan [analyst:] [M]y second question goes back to the last call as well. You were fairly insistent that you would be out of your revolver borrowings by the end of the year. In terms of the miss versus expectations there, was that largely due to lower than expected margins or was there something on the working capital side that happened versus your expectations.
>
> [Defendant] Rowan:  Grant, the track, just to answer your question, to your point, the revolver balance in terms of the balance at the end of the year, we carried forward into '07 *is a result of basically overall sales and profitability trends during the quarter not meeting our expectations and hence the remaining balance on the revolver.*

[Tr. at 7 (Emphasis added)].

148.     Hence, defendants were on notice once again that Linens' forecasting models were materially deficient, but did not hire CDG to "improve its liquidity and cash-flow forecasting and modeling" until "Mid-March 2008," a year later.

149.     In regard to trade support, defendants made the following statements: Carla Casella [analyst:] "[A]nd then have you seen any of your vendors change terms on you?" Defendant Rowan: "None, zero." When pressed on details of trade support terms, defendant Rowan reassured analysts that any apparent "tightening from [Linens'] trade creditors" from a review of the Company's financials was unwarranted, as such was "simply a timing issue. From a vendor perspective, no changes in terms o[r] overall terms from any vendors." [Tr. at 13].

150.     The foregoing statements were materially misleading when made, as defendants knew or were negligent in not knowing that at the time of the conference call, March 15, 2007, the days payables outstanding (DPO) ratio for the first quarter of 2007 was declining steeply, thus signaling a tightening of vendor payment terms.  Indeed, for the first quarter of 2007 it fell from 55.2 days for 2006 to 43.8 days for 2007, or almost 21%.

151.     And once again, defendants played-down any concerns analysts had with macroeconomic factors:

> Carla Casella;  ***And then just on the comp – do you think any of the weakness this year could be housing slowdown related*** or do you attribute it mostly to the competitive environment?
>
> [Defendant] DiNicola:   Well, first off, there's always a strong competitive environment out there whether the housing market is good or not good so that will never change.  ***And I guess that the housing situation is not helping right now. It's certainly not going to change what we need to do here at Linens*** 'n Things in terms of repositioning the business as we've been discussing.  ***Probably not, there definitely isn't a tail wind out there.  It's probably a little bit of a head win[d] but nonetheless everybody is in the same boat.***  We all have to work through it and the things that we are doing here at Linens 'n Things are the right things for the business and will ultimately result in a much stronger brand and higher levels of productivity across the board.  ***So it's not going [to] change anything we are doing*** although we always would like to see it better.

[Tr. at 9 (emphasis added)].

152.     In addition, defendants reported that they were well below targeted EBITDA or sales per square foot of store space of $185, as announced in the "road show," and later statements.  Tr. at 9.  "[R]ight now we are not [on target] because we are still in the $150, $155 level per square foot."  [Defendant DiNicola, Tr. at 18]

153.     However, when asked "[w]hat comp store sales do you need in order for your occupancy and SG&A cost to be neutral year over year, in order for them not to be deleveraging?" Defendant DiNicola refused or was unable to provide an answer and replied by

stating: "I'm sorry, Thomas, but we are not going to get into a specific exercise in terms of outlining that compact to be exactly X to achieve SG&A of Y." Tr. at 18.

154.    However, to quell the foregoing concerns raised by analysts and others, defendants maintained that "our liquidity at the end of the year being a little over $400 million is certainly sufficient for us to operate the business on a go-forward basis so we are comfortable with that, and no real changes within the operation."  Tr. at 13 [Defendant Rowan].

155.    Defendant Rowan also alleviated any concern with breaching the Credit Facility's covenants:

> Randy Risman [analyst:] [W]hat are the covenants or I guess any restriction in terms of you being able to tap into that facility if the leverage continues to tick up?
>
> [Defendant] Rowan:   We have a covenant specifically regarding access availability.  It's actually outlined in both the Qs and the Ks.  But we've had no issues whatsoever in reaching those levels, by the way, from an access availability so that includes our peak borrowing during middle of Q4.

[Tr. at 14].

156.    Defendants knew or were negligent in not knowing that the immediately preceding statements at ¶¶144,147,155 made by defendant Rowan were false and misleading when made as defendants' 2007 revenue projections were too optimistic and failed to consider the deteriorating sales trends in the first quarter of 2007, as explained at ¶123-26.

157.    In addition, defendants knew or were negligent in not knowing that the $400 million "liquidity" was false and misleading for the following reasons: it was dependent upon vendors not tightening credit terms (which they were), as Fitch pointed out a year later, "this would hinder LIN's sales and cash flow generation.  In addition, this would negatively affect the company's borrowing base on the credit facility, as the borrowing base is based on eligible inventory and receivables."  [April 9, 2008 Bloomberg, Fitch Downgrades [Linens]"].

158.    Indeed, at December 29, 2007, the Company had $302.9 million available under

its credit facility as reported on March 20, 2008, and filed for Chapter 11 only weeks later.  *Id.*

**The Form 10-K for the Year Ended December 31, 2006 (the "2006 10-K")**

159.    On March 27, 2007, defendants caused Linens to file the 2006 10-K.  Defendants

DiNicola, Rowan, Copses, Jhawar, Neibart, Pall and Gatto signed the 2006 10-K.

160.    The financial statements contained in the 2006 10-K contained no "going

concern" discussion anywhere therein.

161.    The Statement of the Financial Condition contained in the 2006 10-K reported,

*inter alia,* that the carrying value of "Property and equipment, net," was $530,829,000;

"Identifiable intangible assets, net" was "$150,044,000," and "Goodwill" was "$267,830,000."

The total value of these long-term assets subject to impairment analysis was $948,703,000 or

over half of the Company's total reported assets of $1.9 billion.[7]  2006 10-K at 55.

162.    The 2006 10-K reported in the notes to the financial statements that it had the

following accounting policy concerning "Impairment of Long-Lived Assets (Including

Goodwill):"

> In accordance with SFAS No. 144, "Accounting for Impairment or Disposal of
> Long-Lived Assets," long-lived assets, such as property and equipment and
> purchased intangible assets subject to amortization, are reviewed for impairment
> whenever events or changes in circumstances indicate that the carrying value of
> an asset may not be fully recoverable.  Recoverability of assets to be held and
> used is measured by a comparison of the carrying amount of an asset to estimated
> undiscounted future cash flows expected to be generated by the asset. If the
> carrying amount of an asset exceeds its estimated future cash flows, an
> impairment charge is recognized for the amount that the carrying value of the
> asset exceeds the fair value of the asset, which is determined by discounting the
> future cash flows expected to be generated by the asset.
>
> In accordance with SFAS No. 142, "Goodwill and Other Intangible Assets,"
> goodwill and intangible assets that have indefinite useful lives are tested annually

---

[7]  The value of "Inventories" reported in the 2006 10-K was $793,002,000, which together with accounts
receivables, made up the bulk of the remaining assets.

for impairment.  These assets are tested for impairment more frequently if events and circumstances indicate that the asset might be impaired.  An impairment loss is recognized to the extent that the carrying amount exceeds the asset's fair value. For goodwill, the impairment determination is made at the reporting unit level and consists of two steps.  First, the Company determines the fair value of a reporting unit and compares it to its carrying amount. Second, if the carrying amount of a reporting unit exceeds its fair value, an impairment loss is recognized for any excess of the carrying amount of the reporting unit's goodwill over the implied fair value of the reporting unit in a manner similar to a purchase price allocation in accordance with SFAS No. 141.  The residual fair value after this allocation is the implied fair value of the reporting unit goodwill.

[2006 10-K, at 62-63].

163.     *Thus, Linens' stated accounting policies appeared to be in accordance with GAAP,* as described above.  Later in the financials, the Company explains the relatively small impairment charges it did take for fiscal 2006.

164.     At page 66 of the 2006 10-K, it states in this regard:

[T]he Company's judgments regarding the existence of impairment indicators are based on market conditions and operational performance.  Future events could cause the Company to conclude that impairment indicators exist and that the value of the long-lived assets and goodwill is impaired.  As of December 30, 2006 and December 31, 2005, the Company's net book value for property and equipment was approximately $530.8 million and $612.2 million, respectively, goodwill was approximately $267.8 million and $18.1 million, respectively, and identifiable intangible assets, net was $150.0 million and $1.3 million, respectively.  The increase in the goodwill and identifiable intangible assets, net was primarily due to the acquisition of the Predecessor in February 2006.

During the periods February 14, 2006 to December 30, 2006, fiscal 2005 and fiscal 2004, the Company determined that the carrying value of certain assets exceeded their related estimated future undiscounted cash flows.  As a result, the Company reduced the carrying value of property and equipment to fair value by approximately $28.0 million, $4.1 million and $0.9 million for the periods February 14, 2006 to December 30, 2006, fiscal 2005 and fiscal 2004, respectively.  The related impairment loss was recognized in selling, general and administrative expenses on the company's consolidated statement of operations. In addition, during the period February 14, 2006 to December 20, 2006, the Company reduced the carrying value of favorable leases included in identifiable intangible assets, net by $3.1 million with a corresponding charge to selling, general and administrative expenses.

165.    The immediately preceding statements were materially false and misleading when made: (a)  the $28 million write-down of fixed assets, representing only 3% of the carrying value of such assets was insufficient given that: (i) the Company consistently incurred operating losses for the previous four quarters; (ii) cash flows from operating activities were negative for all of the previous four quarters; (iii) at least 120 stores were underperforming" and would be scheduled for closure approximately one year from the date of the issuance of the 2006 10-K (*i.e.,* March 27, 2007) with associated "impairment charges" taken for "underperforming property" of $36.4 million, and (b) Linens was incapable of accurately evaluating the profitability and\or cash flows associated with stores to determine whether the respective long-term assets groups and\or goodwill values were impaired  (i) within one year of the issuance of the 2006 Form 10-K, although defendants stated at various times in 2007 that "we regularly review our store portfolio for opportunities to move or close unproductive store locations," defendant DiNicola stated at the March 20, 2008 conference call that Linens was just now performing a "strategic review of all stores with negative four wall EBITDA" for closure and defendant Rowan stated on the same conference call that he did not know the "financial impact" of closing such stores; (ii) indeed, as explained in the Linens' Response, the Company was required to hire CDG to "improve [the Company's] liquidity and cash-flow forecasting and modeling" and assess "its real estate portfolio;" and, (iii) in an SEC filing dated May 13, 2008 (Form NT 10-Q), Linens stated that it could not file the required SEC reports on Form 10-Q for the first quarter of 2008 ended March 31, as, *inter alia,* it was "performing an impairment analysis related to certain of its tangible and intangible assets, which is not yet complete. . . at this time the registrants cannot predict the outcome of the impairment analysis, which could

result in the Report reflecting a significant change in results of operations from the corresponding period for the last fiscal year."

166.    Finally, note 4 to the financial statements contained in the 2006 10-K contained an extensive note concerning "Restructuring and Asset Impairment Charges" for the "Predecessor's" 2001 "strategic initiative designed to improve store performance and profitability.  This initiative called for the closing of certain under-performing stores, which did not meet the Predecessor's profit objectives."  The Predecessor had established various reserves and impairment charges for the closing of such stores and related early lease terminations, including "fixed asset impairments represent[ing] fixtures and leasehold improvements."  [2006 10-K at 72].  Although, the Company reported the closure of two stores in 2006 [2006 10-K at 26], note 4 did not report any related impairment charges for such closures.

167.    Similar to defendants' statements made at the March 15, 2007 conference call, the 2006 10-K was replete with positive statements concerning defendants' nine year "turnaround plan," including the adequacy of the Company's financial condition.

168.    For example at page seven of the 2006 10-K under the caption entitled "Strong and Diversified Vendor Relationships," defendants made the following overly-optimistic statements:

> The Company is one of the largest purchasers of home furnishings in the United States and has developed strong long-term relationships with its vendors, from whom it consistently purchases large quantities of quality merchandise. The Company believes that its strong and diversified vendor relationships coupled with its buying power provides it a competitive advantage in the U.S. home furnishings market. In addition, due to its broad range of branded products, the Company's success is not dependent on any one specific product or vendor. In fiscal 2006, no single vendor accounted for more than 8% of its purchases.

169.     The immediately preceding statement was materially false misleading when made, as defendants knew or were reckless in not knowing that vendors already were tightening credit terms as DPO decreased significantly as can be seen from the schedule at ¶76. By one method employed by analysts covering Linens (*see infra,* ¶206), DPO declined from 43.5 days in the 2005 fiscal fourth quarter to 38.6 days in the fourth quarter of 2006, and\or by employing either method at ¶76, the DPO was declining significantly in the 2007 first fiscal quarter, as well.

170.     Similar to the 2007 10-K and the SEC's concerns with positive statements made pursuant to Item 303 of Reg. S-K, "Management's Discussion and Analysis of Financial Condition and Results of Operations" (the "MD&A"), the 2006 10-K contained substantially identical disclosures, as follows:

> The Company's financial performance is significantly affected by the Transactions.  The incurrence of long-term debt to finance the Transactions results in materially higher interest expense and the application of purchase accounting results in significantly higher depreciation and amortization, which make the net income (loss) of the Company not comparable to those of the Predecessor Entity before the Transactions.  None of these effects of the acquisition affect the Company's underlying fundamentals, which management believes remain strong, including its strong brand name recognition and attractive real estate locations.

[2006 10-K at 3]

171.     The immediately preceding statement is false and misleading when made, as defendants knew or were reckless in not knowing that the application of purchase accounting also may and should have resulted in significantly higher impairment charges (as explained at ¶¶58-68), as well as depreciation and amortization, and thus, could "affect of the Company's underlying fundamentals" because increased impairment charges would result in materially larger charges to income, and thus, could affect availability of credit.

172.    The 2006 10-K also contained the following statements at 46:   "Management currently believes that the Company's cash flows from operations and its availability under the Credit Facility will be sufficient to fund its expected capital expenditures, working capital and non-acquisition business expansion requirements as they become due[.]"

173.    The preceding statement was materially false and misleading when made as defendants knew or were negligent in not knowing that that there was a faulty basis to expect "cash flows from operations" and "availability under the Credit Facility" would be sufficient to fund the Company's requirements for 2007, as: (a) the Company's forecasting models were deficient, and defendants were unable to reasonably forecast results without the assistance of an outside consultant (¶¶66-7,280); and (b) vendors were already tightening credit terms (¶¶76-9), which "would negatively affect the company's borrowing base on the credit facility, as the borrowing base is based on eligible inventory and receivables."  [April 9, 2008 Bloomberg, Fitch Downgrades [Linens]"].

174.    The price of the Notes rose on the quoted false and misleading statements contained in the 2006 10-K, from its price on March 26, 2007 of $93.25 to $95.50 on March 28, 2007.   Shortly after the foregoing statements were made, including but not limited to those contained in the 2006 10-K, and as a result thereof, Levine commenced purchasing Notes.

175.    On May 4, 2007, Levine made its first purchases of the Notes, purchasing $6 million principal value, with the Notes trading at or around $94.00.

176.    On May 10, 2007, Levine made another purchase of $2 million face value of Notes, with the Notes trading at or around $93.25.

177.    On May 15, 2007, defendants caused Linens to file on Form 8-K its earnings release for the quarter ended March 31, 2007 (the "2007 8-K1Q").  The 2007 8-K1Q was signed

by defendant Rowan.  The Company reported a net loss of $58.2 million for the quarter and an operating loss of $69.5 million.   In addition, the Company reported net cash used in operating activities of $147.1 million for the same period.  Finally, the Company reported "Adjusted EBITDA" of negative $33 million.

178.     Also on May 15, 2007, defendants caused Linens to file on Form 10-Q its quarterly report with the SEC (the "2007 1Q-10Q").  The 2007 1Q-10Q was signed by defendants Rowan and DiNicola.   The Company reported the carrying values of long-term assets subject to impairment at March 31, 2007, which were essentially unchanged from those respective values reported in the 2006 10-K.

179.     For instance, the 2007 1Q-10Q reported the March 31, 2007 value of: (a) "Property and Equipment, net" was $509,740,000; (b) "Goodwill" was $270,134,000; and (c) "Identifiable intangible assets, net" was $148,152,000.

180.     In addition, the 2007 1Q-10Q stated the following:

> The accompanying condensed consolidated financial statements are unaudited.  In the opinion of management, the accompanying condensed financial statements for [Linens] include all normal and recurring adjustments that are considered necessary to present fairly the financial position and the results of operations and cash flows for the respective periods presented.  . . . The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires . . . These condensed consolidated financial statements should be read in conjunction with audited consolidated financial statements for the fiscal year ended December 30, 2006 included in Company's 2006 Annual Report on Form 10-K available from the [SEC] or through the Company's website at *lnt.com* posted on March 27, 2007 . . .

[2007 1Q-10Q at 7].

181.     The preceding quoted figures and statements contained in the 2007 1Q-10Q at ¶178-80 were materially false and misleading for the same reasons as the 2006 10-K were (*supra,* ¶¶165,171,173).  In addition, the 2007 1Q-10Q was not presented in accordance with

GAAP, because, *inter alia,* the financials contained therein did not "include all normal and recurring adjustments considered necessary to present fairly the financial position and results of operations and cash flows," as at least fixed assets and goodwill were substantially overstated for the reasons stated at ¶¶58-68;182-5.

182.    The 2007 1Q-10Q also reported the following under the note to the financial statements entitled "Impairment of Long-Lived Assets (including Goodwill):"

> The Company's judgment regarding the existence of impairment indicators are based on market conditions and operational performance.  Future events could cause the Company to conclude that impairment indicators exist and that the vale of long-lived assets and goodwill is impaired.  At March 31, 2007, December 30, 2006 and April 1, 2006, the Company's net book value for property and equipment was approximately $509.7 million, $530.8 million and $601.8 million, respectively, goodwill was approximately $270.1 million, $267.8 million and $265.8 million, respectively, and identifiable intangible assets, net was $148.2 million, $150.0 million and $160.0 million, respectively. ***There was no impairment loss recognized for any of the periods presented.***

2007 1Q-10Q at 31 [Emphasis added].

183.    The immediately preceding statements were materially false and misleading when made, because, *inter alia:* there were impairment losses recognized for the year ending 2006 of $27.9 million described as "represent[ing] the non-cash accelerated write-down of the book value of certain underperforming property and equipment" at page 30 n. (e), to the 2006 10-K.

184.    In addition, the 2007 1Q-10Q also contained the following statements under the MD&A section at 37 contained therein: "The Company anticipates that cash generated from operations together with amounts available under the Credit Facility will be sufficient to meet its future working capital requirements, new store expenditures, new store inventory purchases and debt service obligations as they become due."

185.    The preceding statement was materially false and misleading when made as defendants knew or were negligent in not knowing that that there was a faulty basis to expect "cash generated from operations" and availability "under the Credit Facility" would be sufficient to fund the Company's requirements for the remainder of 2007, as: (a) the Company's forecasting models were deficient, and defendants were unable to reasonably forecast results without the assistance of an outside consultant (¶¶66-7,280); and (b) vendors were already tightening credit terms (¶¶76-9), which "would negatively affect the company's borrowing base on the credit facility, as the borrowing base is based on eligible inventory and receivables." [April 9, 2008 Bloomberg, Fitch Downgrades [Linens]"].

186.    On the same day, May 15, 2007, defendants Rowan and DiNicola held a conference call with analysts and others, including Mr. Andrew Kim from Levine. At the conference call defendants spent some time reassuring analysts and others that the business was turning around or going to turnaround, as the quarter was worse than expected by many. *E.g.,* tr. at 1 ([Defendant] DiNicola: "[W]e were not happy obviously with our negative 5% comps for the quarter or the bottom line for that matter").

> Alexis Gold [analyst:] Okay.  I guess I am just thinking a little bit about the notes you guys issued because they obviously had a two-year call structure, just trying to understand, I mean, if the turnaround was supposed to take three and I think I heard you guys mention a nine-year plan which I actually wasn't fully aware of. Trying to understand when we should really expect to see those benefits? . . . [S]ome sense as to what we should really expect, so when we see the press release we have a better idea for if EBITDA should even be negative because it was definitely more negative than I thought it was going to be this quarter.
>
> [Defendant Rowan:]  Well, when we were talking to you before, we talked about being long-term three-phrase program, three years, three and three year, phase one being the stabilizing phase which we are in right now. . . We're expecting it to turn.  We are very optimistic as we look ahead to our back [sic] back-to-school period, and that's what our goal has been, hasn't changed.  We have not talked

about doing anything other than fixing the business to short, mid, and long-term from day one.   [Tr. 14].

Alexis Gold: Okay.

[Tr. 14-15].

187.    The immediately preceding responses to Mr. Gold's inquiries were materially false and misleading when made, as defendants knew or were negligent in not knowing that defendants' plan was overly optimistic, because it was based upon forecasted revenues and same store sales that were not reasonable as (a) the Company's forecasting models were deficient, and defendants were unable to adequately forecast results without the assistance of an outside expert (¶¶66-7,280); and (b) vendors were already tightening credit terms (¶¶76-9), which "would negatively affect the company's borrowing base on the credit facility, as the borrowing base is based on eligible inventory and receivables."  [April 9, 2008 Bloomberg, Fitch Downgrades [Linens]"].

188.    The foregoing discussion with Mr. Gold ended with defendants either deliberately refusing or unable to respond to his inquiries concerning store level profitability and cash flow.

Alexis Gold:  Okay. Thank you. Then I guess just from – you talk about your top 100 stores being 30% of your business. Is that revenue and EBITDA or is that just revenue?

[Defendant] Rowan: Revenue.

Alexis Gold:  And is it about the same from an EBITDA standpoint?

[Defendant] Rowan: To be honest with you, we don't get into that kind of detail about talking about which stores are driving the EBITDA performance.  That is more of an internal classification that we use. . . [I]t is more about how we fund product, payroll, and just looking at internally . . .

189.    At the same conference call, the following discussion took place between Mr.

Andrew Kim, a Levine Analyst, and defendant DiNicola.

> Andrew Kim [Levine Analyst:]  [O]nce you receive that increased commitment
> from UBS, you're not required to meet any additional covenants except for
> meeting the adequate borrowing base; is that correct?
>
> [Defendant] DiNicola:  That is correct.
>
> Andrew Kim:  Have you had any discussions with your equity sponsor regarding
> capital infusion?
>
> [Defendant] DiNicola:  No. Again going back to point number one, if you look at
> the credit facility, we have enough excess availability to support the business, and
> with the additional 100 million that will just give us more room to run the
> business and get through the turn around and grow the business going forward. . .
> So we're comfortable with the credit facility today, and we're excited about the
> support we received on a go-forward basis with the addition of $100 million by
> the end of the second quarter.

190.    The immediately preceding statement made by defendant DiNicola was materially

false and misleading when made for the reasons stated at ¶¶173,185,187.

191.    Further, defendants were negligent in that they should have known that the

financial condition was materially overstated and net loss understated for failure to record

impairment charges for assets that were securing the Notes, *i.e.,* fixed and intangible assets.

Because impairment charges were not being taken timely and recorded in accordance with

GAAP, the Notes were in default.  As the Credit Facility contained cross-default covenants, the

Credit Facility itself also was in default.

192.    Thus, defendants failed to disclose to Mr. Kim, when he asked about "additional

covenants," the fact that the Notes were in default as was the Credit Facility.

193.    The price of the Notes inched slightly lower after the filing of the 2007 1Q-10Q

from $88.5 on May 15, 2007 to $87.00 on May 16, 2007.

194.    Shortly after the above statements were made and others concerning the 2007 fiscal first quarter results, and as a result thereof, including continued reliance on the false and misleading 2006 10-K, and related statements, as alleged herein, Levine did not sell any of its Notes, and instead continued its purchases of the Notes, as follows:

195.    Levine made several additional purchases of Notes over the next few months.  On May 29, 2007, Levine bought Notes with a principal value of $6,000,000 when the price of the bonds was trading at or around $88.00.

196.    On June 4, 2007, Levine bought an additional $2 million of face value notes, when the price on that date was at or around $85.75. And on June 13, 2007, Levine bought Notes with a principal value of $4 million, when the Notes were trading at or around $82.50.

197.    On August 14, 2007, Linens filed on Form 10-Q its quarterly report with the SEC for the quarter ended June 30, 2007 (the "2007 2Q-10Q").   The 2007 2Q-10Q was signed by defendants Rowan and DiNicola.

198.    The Company reported the carrying values of long-term assets subject to impairment at June 30, 2007, which were essentially unchanged from those respective values reported in the 2006 10-K, except for recurring charges for depreciation and amortization. The 2007 2Q-10Q reported that the June 30, 2007 value of: (a) "Property and Equipment, net" was $487,489,000; (b) "Goodwill" was $270,880,000; and (c) "Identifiable intangible assets, net" was $146,434,000.   [2007 2Q-10Q at 7].

199.    In addition, the 2007 2Q-10Q stated the following:

The accompanying condensed consolidated financial statements are unaudited.  In the opinion of management, the accompanying condensed financial statements for [Linens] include all normal and recurring adjustments that are considered necessary to present fairly the financial position and the results of operations and cash flows for the respective periods presented.  . . . The preparation of financial statements in conformity with U.S. generally accepted accounting principles

requires . . . These condensed consolidated financial statements should be read in conjunction with audited consolidated financial statements for the fiscal year ended December 30, 2006 included in Company's 2006 Annual Report on Form 10-K available from the [SEC] or through the Company's website at *lnt.com* posted on March 27, 2007 . . .

[2007 2Q-10Q at 8].

200.    The preceding quoted figures and statements contained in the 2007 2Q-10Q at

¶¶197-9  were false and misleading for the same reasons as the 2006 10-K were (*supra,*

¶¶165,171,173).  In addition, the 2007 2Q-10Q was not presented in accordance with GAAP,

because, *inter alia,* the financials contained therein did not "include all normal and recurring

adjustments considered necessary to present fairly the financial position and results of operations

and cash flows," as at least fixed assets and goodwill were substantially overstated for the

reasons stated at ¶¶58-68.

201.    The 2007 2Q-10Q also reported the following under the note to the financial

statements entitled "Impairment of Long-Lived Assets (including Goodwill):"

The Company's judgment regarding the existence of impairment indicators are based on market conditions and operational performance.  Future events could cause the Company to conclude that impairment indicators exist and that the vale of long-lived assets and goodwill is impaired.  At June 30, 2007, December 30, 2006 and July 1, 2006, the Company's net book value for property and equipment was approximately $487.5 million, $530.8 million and $590.8 million, respectively, goodwill was approximately $270.9 million, $267.8 million and $265.9 million, respectively, and identifiable intangible assets, net was $146.4 million, $150.0 million and $157.9 million, respectively. ***There was no impairment loss recognized in the condensed statement of operations for any of the periods presented.***

[2007 2Q-10Q at 34 (Emphasis added)].

202.    In addition, the 2007 2Q-10Q also contained the following statements under the

MD&A section at 40 contained therein:

The Company funds its operations through a combination of internally generated cash from operations and from borrowings under the Credit Facility.  The

Company's primary uses of cash are working capital requirements, new store
expenditures, new store inventory purchases and debt service requirements.  The
Company anticipates that cash generated from operations together with amounts
available under the Credit Facility will be sufficient to meet its future working
capital requirements, new store expenditures, new store inventory purchases and
debt service obligations as they become due."

203.    The preceding statement was materially false and misleading when made as

defendants knew or were negligent in not knowing that that there was a faulty basis to expect

"cash generated from operations" and availability "under the Credit Facility" would be sufficient

to fund the Company's requirements for the remainder of 2007, as: (a) the Company's

forecasting models were deficient, and defendants were unable to reasonably forecast results

without the assistance of an outside consultant (¶¶66-7,280); and (b) vendors were already

tightening credit terms (¶¶76-9), which "would negatively affect the company's borrowing base

on the credit facility, as the borrowing base is based on eligible inventory and receivables."

[April 9, 2008 Bloomberg, Fitch Downgrades [Linens]"].

204.    On the same date, August 14, 2007, defendants DiNicola and Rowan held a

conference call with analysts and others.

[Defendant] DiNicola:   [T]here are three groups of stores, A, B, C. Ironically,
even as we talk about emphasizing the top 100 stores, it's actually the bottom 100
stores that are seeing the greatest improvement, quote/unquote . . .

Karen Miller:   [A]re you still comfortable with your store base?  Do you think
that maybe as you complete 3Q or the more important fourth quarter you might
reevaluate your store base and just eliminate some of those [C] stores?

[Defendant] DiNicola:  We're comfortable with the store base the way it is.

*               *               *

Naturally, there will be some stores where the leases are coming up and we
review those kinds of issues on a continuing basis and there's a handful of stores
where we choose not to renew the lease because of a real estate issue or the mall

has deteriorated or there's a better opportunity somewhere else.  That's a handful of situations.  We have 580 stores, currently, we're pleased with them. . .

[Tr. At 5-6].

205.    Notwithstanding the above comments, only a month after these reassuring representations quoted in the immediately preceding paragraph, (a) the Company stated that the "C" base increased to 305 stores, and (b) in or about early May 2008, defendants would put up for sale 120 stores with "negative four wall EBITDA," and belatedly incur, at that time, "$36.4 million of "impairment charges" related thereto.   Defendants' method for computing impairment charges was deficient, as it required the reasonable forecasting of cash flows, which the Company was unable to perform adequately without the assistance of outside consultants such as CDG.  *See supra,* ¶¶58-68,76-9,280.

206.    Defendants also were asked about other liquidity issues such as trade support.

Andrew Kim [Levine:] Has any – do you know of any factor that has stopped providing support to any of your vendors?  [Tr. 6]

[Defendant] DiNicola:  We view it from a merchandising side, we have over a thousand vendors, I mentioned.  During my portion of the call, I think Frank mentioned it during his that vendors have provided continued support for us without any difficulties . . . we work with our vendor structure that way and we enjoy good, solid, strong vendor relationships.  But Frank you talked to some of them on the financial side.

[Defendant] Rowan:  . . . ***As we've said before, time and time again, one of the core elements of our strategy is to operate with more liquidity than we think we'll ever need. We've also indicated that we currently have sufficient liquidity to manage the business as we continue to execute the turnaround strategy.***  As Bob talked about earlier, all of our vendors are being paid on a timely manner, according to terms . . .

\*                           \*                           \*

Randy Raisman [analyst:]  Then just my last question is based on my math, if I look at the days payable outstanding, it looks like – Q2 of last year was in the mid-50s and now that we're in around 49.5.  Is that accurate, A, and B, can you tell us what would have driven that tightening?  Tr. at 9.

[Defendant] Rowan:  There's really no – well, if you recall, we talked about this on the last call, we did reclass out of AP certain expenses that we felt beginning in the 2007 made more sense.  At the end of fiscal '06, we reclassed out of AP [accounts] that were due to customers principally for our gift card, customer rebate, and sales return liabilities and then beginning in Q1 of '07, those items are now reclassed to accrued expenses in order to more accurately reflect the payables.  And then in '07, it's on a comp basis, apples to apples.  I don't know if that's necessarily skewing the math, but at the end of the day, taking $0.02 or $0.03 back, there are no significant changes in our vendor terms that I can point to that would change the math you're describing.

[Tr. at 9].

207.    The immediately preceding statements made by defendants Rowan and DiNicola concerning the Company's liquidity and vendor terms were materially false and misleading, as defendants knew or were negligent in not knowing that defendants' liquidity plan was overly optimistic, because it was based upon forecasted revenues and same store sales that were not reasonable as (a) the Company's forecasting models were deficient, and defendants were unable to reasonably forecast cash flows and results without the assistance of an outside consultant (¶¶58-68); and (b) vendors were already tightening credit terms (¶¶76-9), which "would negatively affect the company's borrowing base on the credit facility, as the borrowing base is based on eligible inventory and receivables."  [April 9, 2008 Bloomberg, Fitch Downgrades [Linens]"].

208.    Further, the explanation for the change in accounts payable balances provided by defendant Rowan was now inconsistent with the previous explanation for why the balances had declined.  *See* Mar. 15, 2007 Cf. Call, at 14 (stating that increase or decreases of balances of accounts payables at reporting period ends are not indicative of tightening or loosening of terms, as they are just snapshots at a point in time or "a timing issue").

209.    Finally, defendants either deliberately refused or were unable to provide within quarter Revolver balances, letters of credit outstanding, and Credit Facility balances.  Tr. at 8 (defendant Rowan: "[A]s you know, from prior calls, we do not provide interim information regarding revolver balance, LC, excess availability, *et cetera* during the quarter").

210.    Defendants also once again reassured Levine and others at the August 14, 2007 conference call that despite their concerns with deteriorating macroeconomic conditions purportedly nothing has changed, and defendants had everything under control:

> Reade Kem [analyst:] Okay. I don't know if someone asked this already, but did you see any variation by region of the country?  ***For example, some of the places that may have saw the impact from housing more?***
>
> [Defendant] DiNicola:  You know the tougher regions of the country as well as I do, Reid.  Those areas with the more difficult housing markets, I think, were experiencing a more challenging environment, such as Florida, for example, or portions of the West Coast, for example.  But at the same time, there are areas within those regions that in spite of the housing market or the economy are doing well, simply because they're executing better out in the field.  ***So once again, it goes back to the level of expertise of the management team, as much as if not more than the external environment that makes the difference.***

[Tr. at 16 (emphasis added)]

*          *          *

> Carla Casella:  [Y]ou've talked in the past about your sales per square foot relative to your largest competitor.  Has your target changed or where you think you can get to within their sales per square foot?
>
> [Defendant] DiNicola:  Well Carla, our targets certainly haven't changed.  We have both a challenge as well as an opportunity to grow the business and that has not changed.  What has changed, a little bit, is the external environment and what has changed probably is the competitive level because of that environment.  But our goals and our targets have not changed, nor has the level of intensity or the excitement of our team as they take on these challenges and [] what the objectives are as well as anyone does and they're bound and determined to achieve their goals and we're seeing progress every day.  So the answer to your question is, no we haven't changed anything.

[Tr. at 17].

211.    The preceding statements were false and misleading when made as defendants'
purported internal projections concerning cash flows were unrealistically positive given the
macroeconomic headwinds facing the Company and the Company's inability to reasonably
forecast revenues and cash flows.  Thus, defendants' failed to disclose at least the following: (a)
the Company was in the process of conducting an impairment analysis on long-term assets,
which would yield an over $16 million charge (which was still deficient; *see* ¶¶66-7,280) to
earnings in the fiscal third quarter not reported until November 13, 2007, and (b) within only a
matter of months, defendants would file for bankruptcy and (c) put up for sale 120
"underperforming" stores and belatedly incur an additional $36.4 million impairment charge for
such, but only after receiving earlier assistance from an outside consultant (CDG), to "help the
Company improve its liquidity and cash-flow forecasting and modeling" and "alternatives for
managing liquidity, its cost structure and its real estate portfolio" to create additional liquidity.

212.    Later in the same conference call, defendants went back to questions concerning
"profitable or unprofitable stores" as defendant DiNicola conceded "we were a little flippant on
that answer."  [Tr. at 18].

> [Defendant] DiNicola:  [A]s we said earlier, in case someone is just joining the
> call, we have 580 stores, the key is to get the core business issues taken care of so
> that all the stores can show growth and success.  Finally, we're happy with the
> store base, we're not looking to shrink it.  We review the store portfolio on a
> continuing basis and as leases come up, because of changing circumstances,
> environment, new malls, competitiveness, sometimes we chose not to renew a
> lease. . . So this is a productivity issue, not a real estate one and therefore when
> we fix our core businesses and they're all on solid ground, the stores will follow.
> Now back to your tabletop question, I'm sorry, I just had a --.

[Tr. at 18].

213.    The preceding statements were false and misleading when made as defendants
knew or were negligent in not knowing that it was "a real estate issue" and not simply a matter of

better execution, and that Linens' property, equipment, identifiable intangible assets, and goodwill were materially overstated for failure to take appropriate asset impairment charges. In only a matter of months, defendant DiNicola would inform Apollo that: "No Volume = No Cash – Can't Pay Bills," and sometime prior to January 18, 2008, CIT significantly reduced and\or terminated the Company's credit insurance; shortly thereafter, Linens filed for bankruptcy and placed up for sale 120 "underperforming stores" and took additional impairment charges thereon of $36.4 million only after obtaining assistance from an outside consultant.  *See* ¶¶66-7,280.

214.    In addition, the defendants had the following exchange concerning "distressed merchandise" and its whereabouts:

> Art Weiss [analyst:] Do you guys – *all this obsolete inventory, is it all on the store floors, or is it in warehouses as well?*
>
> [Defendant] Rowan:  *The lion's share of it is on the selling floor.  Stores with lots of room,* stores in excess of 35,000 feet generally have the luxury of *having a clearance room, which they take advantage of.  The smaller stores deal with their clearance merchandise as part of their in-line department.*  So space is devoted to it during our plan agreement process [sic], but there is an orderly way to effectively deal with the clearance operationally out in the stores as well as along with a financial plan as well.

[Tr. at 25 (Emphasis added)].

215.    The foregoing statements made by defendant Rowan were materially false and misleading, for as admitted at the March 20, 2008 conference call by defendant DiNicola "the off sites [including trailers behind stores] are disappearing slowly but surely." [Tr. at 15].

216.    Relatedly, defendants misrepresented that Linens was increasingly successful at reducing the level of "distressed" inventory throughout 2007.  For example at the May 15, 2007 conference call, defendants stated that "distressed inventory" was at between 17 and 18% and the goal was to reduce it to 10% of inventory.   At the August 14, 2007, conference call, defendants stated that the distressed inventory level was at between 15 and 17%; and at the November 13,

2007 conference call, defendants stated that it was down by 14%.   However, at the March 20, 2008 conference call, defendants stated that the distressed inventory was now back at 17%. Defendant Rowan rationalized that the increase was due to the seasonality of the reduced current inventory for the fourth quarter 2007.   At the same time, Linens apparently did not provide for any reserves for reaching its 10% targeted "distressed inventory" level, as did it predecessor.

217.     The following statements also were made at the August 14, 2007 conference call. Clearly, analysts and others increasingly were concerned with the Company's liquidity, but defendants reassured them that it was all in the execution, which purportedly was on track:

> Gabriel Lubena [analyst:]  Okay.  Has the $219 million in the revolver that you had available at the end of June, has that increased or decreased without giving away too much information over the last month?
>
> [Defendant] DiNicola:  Again, I apologize, Gabriel, but we've been clear that we don't provide interim liquidity information during the quarter.
>
> Lance Vitanza [analyst]:  Any change to the new store or closings guidance? Is that still 20 and 0 for the full year?
>
> [Defendant] DiNicola: Still 20 new stores, approximately and at this point no closings scheduled.
>
> *                    *                    *
>
> Lance Vitanza [analyst:]  Okay.  You mentioned a number times on the call that your liquidity position is more than adequate.  I think that was the phrase you used.  Your bonds are trading in the mid-60s.  Any way to take advantage of that[?] Did the terms of your revolver allow you to repurchase bonds?  Is there a way to have someone make an equity investment and kind of realize that opportunity or use cash on hand or use the revolver for it?
>
> [Defendant] DiNicola:  We're focused on turning around the business.  At the end of the day, the enhanced liquidity that we have picked up and we've worked with is all about driving the business.  To Bob's point, it's all about execution at the store level, content and satisfying the guests. So we're focused on the business right now.

[Tr. At 23-4]

218.    The immediately preceding statements made by defendant DiNicola were materially false and misleading when made as defendants knew or were negligent in not knowing that there was no "enhanced liquidity" "picked up" and it was not "all about execution at the store level," as sales were continuing to decline likely well below forecast, and the forecasts themselves were deficient, as later admitted by the Company when it hired CDG in "mid-March 2008" to "improve [the Company's] liquidity and cash-flow forecasting and modeling" and manage "liquidity," the Company's "cost structure," and "its real estate portfolio," to create "additional liquidity."   In addition, vendors had been tightening terms since no later than the 2007 first quarter, which could restrict borrowings under the revolver, as vendor tightening "would negatively affect the company's borrowing base on the credit facility, as the borrowing base is based on eligible inventory and receivables."  [April 9, 2008 Bloomberg, Fitch Downgrades [Linens]"].

219.    Following the foregoing statements, the price of the Notes rose from its price on the previous day (August 13, 2007) of $62.25 to climb to $66.25 on August 14, 2007.  On August 15, 2007, the price of the Notes was at $65.50.

220.    Shortly after the above statements and others concerning the 2007 fiscal second quarter results were made, and as a result thereof, including continued reliance on the false and misleading 2006 10-K and 2006 10-K\A (filed on September 28, 2007), Levine did not sell any of its Notes, and instead continued its purchases of the Notes, as follows.

221.    On August 20, 2007, Levine bought Notes with a principal value of $1,000,000, when the price of the bonds was trading at $64.00.  And on August 21, 2007, Levine bought Notes with a principal value of $7 million, when the price of the Notes was at $64.25.

222.     Levine continued to purchase additional Notes on September 26, 2007 ($2 million face, when the price was at $69.313); October 3, 2007 ($1 million face, when the price was $69.625); October 4, 2007 ($1 million face, when the price was $69.875); and October 9, 2007 ($1 million face, when the price was $71.50).

223.     Increasingly concerned with the financial condition and prospects of Linens, Levine decided it wished to meet face to face with Linens' representatives.  Linens agreed to meet with Levine at Linens' headquarters at 6 Brighten Road, Clifton, New Jersey 07015.

224.     Thus, on October 26, 2007, senior representatives of Levine, specifically Messrs. Andrew Kim and John Klinge met with Barbara Smith, Treasurer of Linens and defendant Rowan at Linens' Clifton, New Jersey headquarters.

225.     At the meeting, defendants provided the number of stores in each of the "three buckets" for stores based on revenue yields, A (100 stores), B (175 stores), and C (305 stores).

226.     According to the Linens representatives at the October 26, 2007 meeting, the "A" stores generated 30% of revenues.  Linens stated previously that C stores were turned around as they were now benefiting from the "narrowing and deepening of the merchandise strategy and from the commitment by new management to these C stores." Defendants represented that unlike now, the former management would just allocate inventory to stores without reviewing what the top performers were at each store.

227.     At the October 26, 2007 meeting, Linens also stated that it had "no plans to close stores, currently."  However, "management was not opposed to closing stores."  But because stores take approximately four to five years to reach full profit potential and the Company added 140 new stores in the past three years, management does not wish to close stores that eventually

could be profitable.  Linens also represented that "in the last 3 years, 89% of the stores have been built, remodeled or refreshed."  And that the "average age of a store is 5 years."

228.    At the October 26, 2007 meeting, Linens also represented that there was "no change in vendor terms."  And that "the Company only received two calls from vendors in October 2007." Linens also stated that it sends "weekly flash reports to Apollo," while Linens management receives "daily store information" on an "AS 400 IS system" at the October 27, 2007 meeting.

229.    However, the preceding statements concerning any change in vendor terms was materially false and misleading as DPO materially deteriorated since not later than the 2007 first fiscal quarter, Linens situation was "dire for a while" according to defendant DiNicola, and Linens shortly would lose its vendor credit insurance.  At the very least, defendants had a duty to disclose the change in vendor terms and\or correct their statements made at the October 26, 2007 meeting with Levine representatives.

230.    In addition, defendants had no good faith or reasonable basis to reassure Levine concerning the Company's liquidity and strategic plans for at least the following additional reasons: (a) the Company's forecasting models were deficient, and defendants were unable to reasonably forecast results without the assistance of an outside consultant (¶¶66-7,280); and (b) vendors were already tightening credit terms (¶¶76-9), which "would negatively affect the company's borrowing base on the credit facility, as the borrowing base is based on eligible inventory and receivables."  [April 9, 2008 Bloomberg, Fitch Downgrades [Linens]"].

231.    Indeed, not later than in or about the fourth quarter of 2007, sales and cash flows had become so grim that on or about January 18, 2008, CIT canceled Linens' vendor credit insurance (*see* ¶¶80-4) and defendant DiNicola in or around January 2008, in a meeting with

defendant Apollo, described Linens' situation as **_"dire for a while"_** and under the heading "Cash Flow," he wrote, "No Volume = No Cash – Can't Pay Bills," adding that the Company must "stop reliance on low margin sales."  Not only did defendant DiNicola's notes indicate that the Company was insolvent "for a while," but so did Dyson.  *See Dyson complaint,* at ¶9 ("LNT's solvency and continued ability to pay has come into question as a result of changes in its credit insurance carriers, reductions in its credit limits and ultimately being dropped by its credit insurance carrier, CIT . . .").  Thus, to the extent Linens was insolvent (which it was), it owed fiduciary duties to Levine.

232.    In short, defendants at the October 26, 2007 conference with Levine representatives falsely reassured plaintiff of the adequacy of Linens' strategic plan, its liquidity position and its relationships and terms with its vendors.

233.    Shortly after the October 26, 2007 meeting with Linens, and as a result thereof and all the prior alleged false and misleading statements, including those contained in the 2006 10-K, Levine did not sell any of its Notes, and instead continued its purchases of the Notes, as follows:  (a) October 31, 2007, $3,500,000 face value, when the price was at $66.375; (b) November 2, 2007, $1 million face value, when price was at $$63.825; (c) November 5, 2007, $2 million of face amount, at an average price of approximately  $63.438.

234.    On November 13, 2007, defendants caused Linens to file on Form 8-K its earnings release for the quarter ended September 29, 2007 (the "2007 8-K3Q").  The 2007 8-K3Q was signed by defendant Rowan.  Therein, it was reported that Linens generated a net loss for the third quarter of $79.9 million and an operating loss of $56.6 million.  In addition, it was reported that net cash used in operating activities was $261.3 million and "Adjusted EBITDA" was negative $3 million for the quarter.

235.    Notwithstanding the foregoing news, defendant DiNicola was quoted as making the following positive statements in the release attached to the 2007 8-K3Q:

> "Despite the ongoing challenges in the retail environment, we posted significantly improved same-store sales in the third quarter compared to the second quarter," said Robert DiNicola, . . . "In addition, we were encouraged by a healthier sales mix during the third quarter, with both the housewares and textiles categories generating positive comparative store sales. . ."

236.    Also, on November 13, 2007, defendants caused Linens to file on Form 10-Q its financial statements for the quarter ended September 29, 2007 (the "2007 3Q-10Q"). Defendants DiNicola and Rowan signed the 3Q-10Q. [2007 3Q-10Q at 13].

237.    The 2007 3Q-10Q stated the following:

> The accompanying condensed consolidated financial statements are unaudited. In the opinion of management, the accompanying condensed financial statements for [Linens] include all normal and recurring adjustments that are considered necessary to present fairly the financial position and the results of operations and cash flows for the respective periods presented. . . . The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires . . . These condensed consolidated financial statements should be read in conjunction with audited consolidated financial statements for the fiscal year ended December 30, 2006 included in Company's 2006 Annual Report on Form 10-K available from the [SEC] or through the Company's website at *lnt.com* posted on March 27, 2007 . . .

[2007 3Q-10Q at 8].

238.    The 2007 3Q-10Q also reported the following under the note to the financial statements entitled "Impairment of Long-Lived Assets (including Goodwill):"

> The Company's judgments regarding the existence of impairment indicators are based on market conditions and operational performance. Future events could cause the Company to conclude that impairment indicators exist and that the value of long-lived assets and goodwill is impaired. At September 29, 2007, December 30, 2006 and September 30, 2006, the Company's net book value for property and equipment was approximately $447.8 million, $530.8 million and $572.5 million, respectively, goodwill was approximately $272.1 million, $267.8 million and $265.7 million, respectively, and identifiable intangible assets, net was $144.6 million, $150.0 million and $155.4 million, respectively.

71

During the thirteen weeks ended September 29, 2007, the Company determined that the carrying value of certain property and equipment exceeded its related estimated future undiscounted cash flows. As a result, the Company reduced the carrying value of property and equipment to its fair value by approximately $16.8 million.

There was no impairment loss recognized in the condensed consolidated statement of operations for any of the prior year periods presented.

[2007 3Q-10Q at 35].

239.    The preceding quoted figures and statements contained in the 2007 3Q-10Q at ¶¶237,238 were false and misleading for the same reasons as the 2006 10-K (*supra* ¶¶165,171,173).  In addition, the 2007 3Q-10Q was not presented in accordance with GAAP because, *inter alia,* the financials contained therein did not "include all normal and recurring adjustments considered necessary to present fairly the financial position and results of operations and cash flows," as at least fixed assets and goodwill were substantially overstated. Within only a few weeks, defendants told Apollo that there was insufficient cash flow to pay bills; CIT cancelled its insurance coverage for vendor financing.  And within a few months thereof, the Company would file for bankruptcy and put up for sale 120 "underperforming stores" and incur an additional $36.4 million in impairment charges therefor.  In addition, the Company conceded in later SEC filings that it was unable to prepare such in accordance with GAAP, as it was still, months later, determining impairment charges on fixed and intangible long-lived assets.   The Company hired a consultant in "mid-March 2008" to "improve [the Company's] liquidity and cash-flow forecasting and modeling" a necessary requirement to impairment analysis.  In addition, the consultant, CDG, was hired to provide advice on "alternatives for managing liquidity, [the Company'] cost structure and its real estate portfolio."

240.    In addition, the 2007 3Q-10Q also contained the following statements under the MD&A section at 42 contained therein:

The Company funds its operations through a combination of internally generated cash from operations and from borrowings under the Old Credit Facility through October 24, 2007 and the New Credit Facility thereafter. The Company's primary uses of cash are working capital requirements, new store expenditures, new store inventory purchases and debt service requirements. The Company anticipates that cash generated from operations together with amounts available under the New Credit Facility will be sufficient to meet its future working capital requirements, new store expenditures, new store inventory purchases and debt service obligations as they become due.

241.    The preceding statement was materially false and misleading when made as defendants knew or were negligent in not knowing that that there was a faulty basis to expect "internally generated cash from operations" and availability under the "Old" and "New" Credit Facilities would be sufficient to fund the Company's requirements, as: (a) the Company's forecasting models were deficient, and defendants were unable to reasonably forecast results without the assistance of an outside consultant (¶¶66-7,280); and (b) vendors were already tightening credit terms (¶¶76-9), which "would negatively affect the company's borrowing base on the credit facility, as the borrowing base is based on eligible inventory and receivables." [April 9, 2008 Bloomberg, Fitch Downgrades [Linens]"].

242.    The price of the Notes fell by $3.25 on November 13, 2007 to $58.25 down from its previous trading day's price of $ 61.50.

243.    In continued reliance on the previously alleged undisclosed adverse information, as well as the false and misleading statements alleged above, including those contained in the 2006 10-K, Levine did not sell any of its Notes, and continued its purchases.

244.    Levine made its last purchases of the Notes on November 16, 2007.  On that day, Levine bought $4 million principal value of Notes, which traded at or about $58.00.

245.     In or about early or mid-January 2008, Linens lost credit insurance relating to at least one of its vendors, and thus was unable to continue its normal vendor financing

arrangements.  According to a vendor's complaint filed in state court, sometime prior to January

18, 2008, CIT terminated the Company's credit insurance and therefore, the vendor alleged,

"LNT's solvency and its continued ability to pay ha[d] come into question" and CIT began to

"reduce" "LNT's credit insurance limits."  *Dyson, Inc. v. Linens 'N Things,* 08-cv-2068 (N.D. Ill.

Apr. 11, 2008) (after removal from state court).

246.    In or about the same month, January 2008, according to an April 16, 2008 NEW

YORK POST article, the NEW YORK POST had obtained a copy of DiNicola's "January meeting

notes" with Apollo, where defendant DiNicola described Linens' situation as "dire for a while"

and under the heading "Cash Flow," he wrote, "No Volume = No Cash – Can't Pay Bills,"

adding that the Company must "stop reliance on low margin sales." The article also stated that

"Insiders say a planned Chapter 11 filing is expected to close laggard stores, but protect the

company from liquidation."

247.    On January 23, 2008, defendants issued a press release reporting on fourth quarter

2007 sales results.  The release was attached to a Form 8-K filed with the SEC on January 28,

2008 and signed by defendant Rowan.  The release contained the following statements:

> [Linens] today reported total net sales of $962.9 million for the fourth quarter of
> 2007, a 0.6% increase over the same quarter in 2006.  This increase in net sales
> resulted from the opening of four new stores, partially offset by a comparable
> store sales decline of 1.0% for the quarter.  During the holiday shopping season
> between November 23, 2007 (*i.e.* Black Friday) and December 29, 2007, the
> Company generated comparable store sales growth of +0.9%.  As other retailers
> have reported in connection with their holiday season results, the Company's
> gross margins in the fourth quarter were pressured by a highly promotional sales
> environment. The Company expects to announce Adjusted EBITDA and other
> earnings information later this quarter under its customary timetable.
>
> The Company ended the quarter with an asset-based revolver balance of $205.9
> million, letters of credit outstanding of $53.0 million and excess availability under
> its revolving credit facility of $302.9 million, which was available without
> restriction.

248.     The immediately preceding statement concerning the availability of the revolver without restriction was materially false and misleading when made for at least the following reasons: defendants knew or were negligent in not knowing that loan covenants were breached for both the revolver and the Notes, because (a) the financial statements were not prepared in accordance with GAAP, as long-lived assets, including fixed assets were not adjusted downward for impairment charges that should have been taken but for defendants' deficient cash-flow forecasting and modeling systems and (b) vendors already had tightened and more were in the process of tightening credit terms (*see supra,*  ¶¶76-9), which would negatively affect the company's borrowing base on the credit facility, as the borrowing base is based on eligible inventory and receivables."  [April 9, 2008 Bloomberg, Fitch Downgrades [Linens]"].

249.     Shortly thereafter, "[o]n or about February 19, 2008, the Debtors and Apollo, in its capacity as majority equity owner of the Debtors, engaged [Richards, Layton & Finger, P.A.] for legal advice concerning general issues of Delaware corporate law and fiduciary duties thereunder."   Affidavit of Mark D. Collins, Esq., at ¶12 (filed on or about May 8, 2008) (Bankr. Dist. Del. 08-10832 (CSS)).

250.     On March 20, 2008, defendants caused Linens to file on Form 8-K, the Company's results and financial condition for the fourth quarter and year ended December 30, 2007 (the "8-K4Q").   The Form 8-K was signed by defendant Rowan.

251.     The earnings release attached to the 8-K reported that the Company generated a net loss for the fourth quarter of 2007 of $62.0 million The Company also reported an operating loss of $23.0 million, but positive "Adjusted EBITDA" of $15.3 million for the same period.

252.     For the year ended December 30, 2007, the Company reported a net loss of $242.1 million (as compared to a net loss of approximately $154 million for the same

75

comparable previous year, *i.e.,* 2006).   In addition, the Company reported an operating loss for 2007 of $191.3 million.  Reported net cash used in operations for 2007 was $123.4 million.

253.     The release attached to the 8-K4Q reported, *inter alia,* that "The Company will also ***continue*** to perform strategic reviews of its store base to capitalize on opportunities to reduce its occupancy costs and potentially close or sublease select store locations."  [Emphasis added]

254.     The preceding statements were false and misleading as defendants consistently represented prior hereto that "execution" was key to better operational and financial performance and that store closings were only considered when the respective leases were up and were not part of the "turnaround plan."  Thus, defendants never indicated to the market or Levine until the filing of the 8-K 4Q, that Linens was "performing strategic reviews of its store base to capitalize on opportunities to reduce its occupancy costs and potentially close or sublease select store locations."

255.     Finally, it was stated in the March 20, 2008 in a press release that defendants finally "recognized" "that [i]n light of the current external market environment in the U.S. and the economic headwinds against the Company's efforts to improve the comparable store sales growth," it was necessary for "management" to "undertake" "a series of cost reduction initiatives designed to bring its cost structure in line with its sales productivity."

256.     Also, on March 20, 2008, defendants caused Linens to file on Form 10-K its Annual Report for the fiscal year ended December 31, 2007 ("2007 10-K").  Defendants DiNicola, Rowan, Copses, Jhawar, Neibart and Pall signed the false and misleading 2007 10-K.

257.     In addition to the fact that the Company's financial statements contained no statements indicating that the Company may no longer be a going concern, just as striking was

the fact that there were no additional impairment charges taken in 2007 for long-term assets, just

the $16.8 million taken in the third quarter of 2007 as alleged above.   The 2007 10-K made the

following statements, among others under the notes to the financial statements entitled

"*Impairment of Long-Lived Assets (including Goodwill):*"

> In accordance with SFAS No. 144, "*Accounting for Impairment or Disposal of Long-Lived Assets,*" long-lived assets, such as property and equipment and purchased intangible assets subject to amortization, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be fully recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to estimated undiscounted future cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated future cash flows, an impairment charge is recognized for the amount that the carrying value of the asset exceeds the fair value of the asset, which is determined by discounting the future cash flows expected to be generated by the asset.

> In accordance with SFAS No. 142, "*Goodwill and Other Intangible Assets,*" goodwill and intangible assets that have indefinite useful lives are tested annually for impairment. These assets are tested for impairment more frequently if events and circumstances indicate that the asset might be impaired. An impairment loss is recognized to the extent that the carrying amount exceeds the asset's fair value.  For goodwill, the impairment determination is made at the reporting unit level and consists of two steps. First, the Company determines the fair value of a reporting unit and compares it to its carrying amount. Second, if the carrying amount of a reporting unit exceeds its fair value, an impairment loss is recognized for any excess of the carrying amount of the reporting unit's goodwill over the implied fair value of the goodwill. The implied fair value of goodwill is determined by allocating the fair value of the reporting unit in a manner similar to a purchase price allocation, in accordance with SFAS No. 141 . The residual fair value after this allocation is the implied fair value of the reporting unit goodwill.

> The Company's judgments regarding the existence of impairment indicators are based on market conditions and operational performance.  Future events could cause the Company to conclude that impairment indicators exist and that the value of long-lived assets and goodwill is impaired.  As of December 29, 2007 and December 30, 2006, the Company's net book value for property and equipment was approximately $425.5 million and $530.8 million, respectively, goodwill was approximately $272.4 million and $267.8 million, respectively, and identifiable intangible assets  was $142.8 million and $150.0 million, respectively.

> During fiscal 2007, the period February 14, 2006 to December 30, 2006 and fiscal 2005, the Company determined that the carrying value of certain assets exceeded

their related estimated future undiscounted cash flows.  As a result, the Company reduced the carrying value of property and equipment to their fair value by approximately $16.8 million, $28.0 million and $4.1 million for fiscal 2007, the period February 14, 2006 to December 30, 2006 and fiscal 2005, respectively.  The related impairment loss was recognized in impairment of property and equipment on the Company's consolidated statements of operations.  In addition, during fiscal 2007 and the period February 14, 2006 to December 30, 2006, the Company reduced the carrying value of favorable leases included in identifiable intangible assets, net by approximately $0.1 million and $3.1 million, respectively, with a corresponding charge to impairment of identifiable intangible asset.  ***The Company also performed its annual impairment test on goodwill and determined that no impairment exists.***

2007 10-K at 64-5.  [Emphasis added]

258.   The immediately preceding statements were false and misleading when made for at least the following reasons: (a)  the $16.8 million write-down of fixed assets, representing only 4% of the carrying value of such assets, was insufficient given that: (i) the Company consistently incurred operating losses for the previous eight quarters; (ii) cash flows from operating activities were negative for at least all of the previous four quarters; (iii) at least 120 stores were "underperforming" and would be scheduled for closure in only weeks from the date of the issuance of the form 10-K (*i.e.,* March 20, 2008), and (b) Linens was incapable of accurately evaluating the profitability and\or cash flows associated with stores to determine whether the respective long-term assets groups and\or goodwill values were impaired  (i) within weeks of the issuance of the 2007 10-K, defendant DiNicola stated at the March 20, 2008 conference call that Linens was just now performing a "strategic review of all stores with negative four wall EBITDA" for closure and defendant Rowan stated on the same conference call that he did not know the "financial impact" of closing such stores; and (ii) indeed, in a bankruptcy filing dated May 13, 2008 (Form NT 10-Q), Linens stated that it could not file the required SEC reports on Form 10-Q for the first quarter of 2008 ended March 31, as, *inter alia,* it was "performing an impairment analysis related to certain of its tangible and intangible assets, which is not yet

complete. . . at this time the registrants cannot predict the outcome of the impairment analysis, which could result in the Report reflecting a significant change in results of operations from the corresponding period for the last fiscal year;" and (iii) the Company hired CDG in "mid-March" to "improve [the Company's] liquidity and cash-flow forecasting and modeling," a tool necessary for adequately performing impairment analysis.

259.    Finally, on March 20, 2008, Linens also held a conference call reporting on the 2007 Q4 and year-end results and financial condition where analysts and investors asked questions.

260.    At the March 20, 2008 conference call, defendants admitted that they did not consider at all or sufficiently "factors [that] have impacted both sales and margins to a greater extent than was originally planned."  [Tr. at 1]:

> However, even as we've made operational progress, **_we recognize that the financial side of our business has been sorely deficient._**  This has been caused by several key factors.  First, the cost of the massive clean-up itself, the long lead times required to get into new product, **_the timing and decline in the home industry over the past two years,_** and the accelerated deterioration of the economy, thus affecting consumer factors.
>
> *                       *                       *
>
> In light of these challenges, and as we continue to plow ahead with our turnaround plans, **_we most certainly recognize that we need to address certain aspects of our financial performance._**  We know that the external environment is not going to improve any time in the near future.  And in spite of all the progress that has been made on the operational side of the business, which is now relatively stable, **_we must now do more to affect the financial side of the equation going forward._**  Consequently, in those areas that we can control internally, we have developed a comprehensive plan of attack that will address certain expense categories that will help bring our cost structure more in line with our anticipated sales productivity.

Tr. at 1-2 [Defendant DiNicola (emphasis added)]

261.    Defendant DiNicola continued:

> On top of the control measures that we implemented last year, which totaled some
> $25 million, this year we are putting into play additional significant cost
> containment initiatives that will potentially benefit gross margin, EBITDA, and
> liquidity during the current year. . . These plans have been prudently developed
> and are now being executed and are designed in such a way as to avoid impacting
> our ability to flow goods to our stores, to service our guests in the stores, or to
> interfere with our continuing initiative as related to the turnaround of the overall
> business.  The execution of the cost reduction plan is underway and we expect to
> yield savings from these initiatives in the second quarter and throughout the rest
> of the year.

[ Tr.at 2].

262.    The immediately preceding statements were false and misleading when made, as

defendants knew or were negligent in not knowing that the purported "prudently developed"

plans involved closing and putting up for sale at least 22% of the Company's "underperforming

stores" and filing for Chapter 11 bankruptcy protection within only weeks as they knew or were

negligent in not knowing that vendors were tightening credit, as CIT reduced or terminated

Linens' factoring credit insurance, and at least one vendor already filed a complaint against

Linens on March 11, 2008 for nonpayment of invoices billed to the Company months before, but

unpaid as of February 19, 2008. [Dkt. No. 1; *Dyson v. Linens 'N Things,* 08-CV-02068 (N.D.

Ill.)).

263.    Defendants also made the following false and misleading statements at the March

20, 2008 conference call:

> Jason Trujillo [Lehman Brothers Analyst:] [I] was wondering how many stores do
> you plan on closing, if you have that information available yet or ballpark
> number, and then, what do you think will be the impact of that action financially?
>
> [Defendant] DiNicola:  Well we're always reviewing the store base, you know, on
> a quarterly and annual basis and we go through a very detailed review of that.
>
>            *           *           *
>
> Kevin Mah [analyst:] [I] wanted to find out what the timing in terms of when you
> plan to finish evaluating the number of stores that you plan to close?

[Defendant DiNicola:] We evaluate it constantly, so we will continue to do that throughout the balance of the year, and as each one of those individual opportunities arises, we would take advantage of that factor if it was an opportunity.

[Defendant DiNicola, Tr. at 3, 11]

264.    The preceding statements were false and misleading when made, as defendants knew or were negligent in not knowing that heretofore, defendants stated that they only conducted reviews for store closings when "leases were up," not "always" on a "quarterly and annual basis."

265.    Defendants also made the following misstatements concerning vendor terms and payments:

Carla Casella [analyst]:   Okay, and then just one last question.  The days of payables on the – on hand came down slightly from a year ago.  I'm just wondering if you've had any conversations with your vendors, any changing in the terms?

[Defendant] DiNicola:  Frank's the expert on that.

[Defendant] Rowan:  [N]o.  looking at that time change in days, year-over-year, we wouldn't consider it to be a material change.  It may be simply some quarter end cut-off factors but there's nothing specifically related to any change in vendor terms.

[Tr. at 5].

266.    The preceding statements were false and misleading when made, as defendants were at least negligent in not knowing that as a result of CIT terminating Linens' credit insurance, and\or other factors, vendors already were tightening terms since not later than the beginning of the 2007 fiscal first quarter.  ¶¶58-68,80-4.

267.    Defendants then made the following statements to Mr. John Klinge, a Portfolio Manager with Levine:

John Klinge:   [I]n connection with your efforts to evaluate your underlying store base and also evaluate some of the initiatives with respect to SG&A, do you plan to do that yourself, or have you hired or are in the process of hiring outside advisors?

[Defendant] DiNicola:   From time to time, we bring on board some experts or advisors from the field to help us with the evaluation.  But as I mentioned earlier, John we continually review the store performance and review that portfolio on an ongoing basis.  But if it makes sense to bring in additional expertise, we're always open to do that as well.

John Klinge:   Okay. And then, just back to Frank's comments with respect to the trade support, I mean, I realize that maybe year-over-year, we have maybe a 5.6 day decline in the trade support, but I mean, if you go back to '05, we're talking about roughly 24 days loss. So with respect to trade terms, I understand the response, but do you have any comments with respect to some of your other trade support including factoring in credit protection?

[Defendant]  Rowan:  John, it's Frank.   I guess the answer to your first question, we've talked about – I guests it was Carla's question – we continue to pay our vendors in an orderly manner under their normal customary terms. . . But I would say that we certainly feel that we maintain a good, solid relationship with our suppliers.

[Tr. at 5-6].

268.    The preceding statements were false and misleading when made for at least the following reasons: defendants knew or were negligent in not knowing and failed to disclose that (a) Linens already engaged CDG [Rowan Affidavit, May 2, 2008, ¶18], financial experts, who together with others already had or were in the process of determining that 120 "underperforming" stores were to be sold, (b) CIT withdrew its credit insurance for Linens and that at least one vendor, Dyson, had filed suit against Linens for failure to pay invoices that were due not later than February 19, 2008; and (c) vendors had been tightening credit terms significantly since not later than the 2007 fourth quarter (*see supra,* ¶¶58-68,76-9,80-4).

269.    Defendants, in response to questions concerning Linens' liquidity, made the following misstatements at the March 20, 2008 conference call, as well:

[Defendant] Rowan:  Grant, this is Frank.  I think that to answer your question, we believe in looking at our liquidity, we believe our cash flow from operations and availability under the credit facility is sufficient to fund our expected CapEx, our working capital needs and that includes, obviously, our debt service obligations.  . .

[Defendant] DiNicola:  Let me add to that Frank, if I could.   We believe that our cash flow from operations and availability under our credit facility is sufficient to fund our expected capital expenditures and working capital needs, including any and all debt service obligations. . .

Grant Jordan:  [W]henever you say you're comfortable with your liquidity and your ability to service your debt, are speaking indefinite or is that just through 2008?  And then my second question would be, to get to that level, can you give us and idea of what sort of improvement you're factoring in in terms of cash flow/or reduction . . .

[Defendant] DiNicola:  I'll let Frank talk about cash flow.  My reference was for the year 2008, because that's what we have directly in front of us and that's the plans that we put together . ..  Of course, we would always hope that the external environment improves as we go through 2008, although we're not expecting it.

*   *   *

Grant Jordan: So do you know if your auditors are going to give a clean opinion around the 10-K?

[Defendant] Rowan:  Yes, I do and yes, they will.

Grant Jordan:  Okay. Great. Thank you very much.

[Tr. at 6-7].

270.     The preceding statements were materially false and misleading when made, as defendants were at least negligent in not knowing and failed to disclose that (a) within a matter of only weeks, Linens would file for bankruptcy protection and within even less time (not later than April 10, 2008), defendants were meeting with Noteholders to determine whether they could suspend payment of the next quarterly interest payment due them on April 15, 2008; (b) defendants had no good faith or reasonable basis to state that Linens' liquidity was adequate for the forthcoming year, as Linens' forecasting and budgeting process was woefully and

concededly flawed.  *See* Tr. at 11 (***defendant DiNicola: "Oh, sure" in response to the analyst question: "[D]o you feel like there was more that you could have done, I guess, for the past two quarters to improve the financial side of the equation?;"*** *see also* October 14, 2008 Linens'
Response at 9: "One critical event, which the Company did not immediately appreciate would impact its own business, occurred on Friday, March 14 . . .  Bear Stearns & Co., facing imminent collapse, turned to both a rival bank and the federal government for assistance;" "Another rapidly evolving event more directly related to the Company's fortunes concerned CIT Group Inc.  CIT was a primary source of factoring for a substantial number of the Company's vendors that used factoring of accounts receivables to finance their operations.  On Monday, March 17, CIT's counterparty rating was lowered to A-/A-2 with a negative outlook due to continued weakening in the credit markets and its likely drag on earnings. . . ."  Also, on March 20, 2008, Fitch placed Linens' on "credit watch."

271.    Defendants continued to owe fiduciary duties to Levine, as the Company was increasingly insolvent or had been insolvent for quite some time.  These duties included the duty of candor, loyalty and care.

272.    The price of the Notes rose over the next few trading days from the March 19, 2008 price of $30.063 to $31.00 on March 24, 2008.  In reliance on the false and misleading statements made above as contained in the March 20, 2008 press release attached to a Form 8-K, the March 20, 2008 conference call, and the 2007 10-K, Levine did not sell any Notes and continued to retain them.

**Linens Bankruptcy Follows Only Weeks Later**

273.    On March 28, 2008, only a week after the March 20, 2008 conference call and March 20, 2008 SEC filings, none of which reported that Linens was not a going concern, a NEW

YORK POST article stated that Linens "has been delaying payments to the vendors that supply its sheets, towels, curtains and kitchenware."

274.    On April 8, 2008, both the WALL STREET JOURNAL and the NEW YORK POST reported that "Leon Black [of Apollo Management] may soon push the struggling retailer toward bankruptcy."  The NEW YORK POST also had the following to say in the same article:

> Some insiders said Apollo may have pushed GE Capital to tighten the credit line, as it could have more to gain from a prompt bankruptcy filing rather than letting the business try to weather this year's grueling shopping climate. GE Capital didn't respond to a request for comment.

275.    On April 10, 2008, the Company "organized a confidential meeting . . .with the holders of a substantial principal amount of the Notes as an *ad hoc* committee of Noteholders (the "Noteholders Committee").  [Linens' Response at 11]

276.    On April 14, 2008, the Company "held a confidential meeting with its major vendors to discuss the challenges facing the Company by the changes in vendor terms." *Id.* at 12.

277.    On April 16, 2008, the NEW YORK POST reported that it had obtained a copy of DiNicola's "January meeting notes" with Apollo, where he described LIN's situation as "dire for a while" and under the heading "Cash Flow," he writes, "No Volume = No Cash – Can't Pay Bills," adding that the Company must "stop reliance on low margin sales." The article also stated that "Insiders say a planned Chapter 11 filing is expected to close laggard stores, but protect the company from liquidation."

278.    Also on or about April 16, 2008, Sunham Home Fashions, LLC filed a complaint against Linens 'n Things in New York State Supreme Court, County of New York (Index No. 601135/08).  This case was removed to the Southern District of New York on May 1, 2008 (Judge Batts, 08-CV-41137).  Plaintiff alleged that Linens refused to pay for goods received between January 21, 2008 and April 4, 2008 valued at over $1.5 million.  Also alleged, "Plaintiff

has recently learned, upon information and belief, that [Linens] is insolvent and experiencing

extreme financial difficulties that cast substantial doubt on Defendant to pay Plaintiff's bills." ¶6.

279.    On May 2, 2008, defendants caused Linens and Linens Holdings and all of their

affiliates to file for protection under Chapter 11 of the U.S. Bankruptcy Code in bankruptcy court

for the District of Delaware.   Linens Canada filed for protection under the Canadian bankruptcy

laws months later.   The petition itself stated little about why the Company filed for bankruptcy

except that the May 1, 2008 board minutes attached thereto reported that the Boards of the

respective companies "deem it to be desirable and in the best interests of each of the Companies,

their respective creditors, and other interested parties that a petition be filed by each of the

Companies seeking relief under the provisions of chapter 11 of the United States Code, 11

U.S.C. §§ 101 *et seq*. . . ."  Ex. A to the petition.

280.    However, in a 30 page affidavit filed separately on the same date, defendant

Rowan stated the following, *inter alia:*

D.   Events Leading to the Bankruptcy Filing

[¶] 16.   During the first quarter of 2006, the Linens Companies instituted a long-
term turnaround plan designed to grow sales and improve store productivity and
thereby improve profitability and cash flow.  A variety of external economic
factors have led to a precipitous decline in the Debtor's profitability and liquidity
and an inability to continue with their turnaround plan.  [17.] Chief among those
external factors was the decline in the housing market and the tightening of the
credit markets which have led, respectively, to a decline in consumer
discretionary spending, especially in the housewares and home furnishing sector,
and to a tightening of credit terms by the Debtors' suppliers.

　　　　　　　　*　　　　　　　　*　　　　　　　*

E.   The Proposed Store Closing Sales

[¶] 22.   In connection with its prepetition restructuring efforts, the Debtors'
management performed an in-depth analysis of the Debtors' financial
performance to identify areas for improvement.  This analysis helped
management identify some key steps that could be taken to improve the Debtors'

overall financial performance – including the closing of unprofitable stores.  In this regard, the Debtors' management, working closely with [Conway, Del Genio, Gries & Co., LLC ("CDGC")] and its other advisors, undertook a comprehensive review of the performance of each store and market in which the Debtors operate and identified 120 stores . . . as underperforming stores that should be closed at the outset of the Debtors' chapter 11 cases in order to aid in the Debtors' reorganization efforts and to ease certain of the liquidity restraints that the Debtors currently face, by means of store closings . . .

[T]he Debtors believe that the Store Closing Sales are a necessary first-step in mitigating the strain on the Debtors' liquidity, maximizing value of inventory located at the Closing Stores and moving forward with the Debtors' overall restructuring goals.

281.    On the same day, May 2, 2008, defendants caused the Company to file on Form 8-K, *inter alia,* a press release of Linens, dated the same date, the Form 8-K contained the following statement: "Robert J. DiNicola has resigned as President and Chief Executive Officer of Holding and its direct and indirect subsidiaries (collectively the "Companies") effective with the filing of the Chapter 11 Petitions on May 2, 2008.  Mr. DiNicola continues to serve as executive Chairman of the Board of each of the Companies."

282.    On or about September 15, 2008, defendants received a comment letter from the Staff of the SEC primarily concerning the 2007 10-K and Linens' bankruptcy.  The letter was addressed to defendant Rowan.

283.    Therein, the SEC wanted to know, among other things:

• [W]hen you intend to file your Form 10-Q for the fiscal quarters ended March 29, 2008 and June 28, 2008;

• [Concerning the 2007 10-K:]  [W]e also note that your audit report and disclosures do not provide a discussion of any doubt as to the company's ability to continue as a going concern.  In light of the fact that the company filed for bankruptcy under Chapter 11 as of May 2, 2008, please tell us why there is no discussion of the company's liquidity problems in the 10-K;

• [T]ell us why you made the decision to defer the interest payments and restructure the debt, especially given the company's "significantly enhanced liquidity position" disclosed on page 38 of the 10-K?;

- Your also disclose in your April 15, 2008 Form 8-K that "[t]he rapidly increasing financial storm outside the Company, together with our operating results, have accelerated credit insurance problems for our vendors, causing them to recently begin imposing significantly more restrictive payment terms on [Linens]. These factors have  had a dramatic effect on our liquidity outlook for the remainder of the year. . . ."

- Please  tell us the dates when these events occurred and explain to us in more detail how the events impacted your liquidity.

284.    On September 22, 2008, defendant Rowan "resigned" effective October 6, 2008 from the Company and was replaced by Scott M. Hurd, the existing Vice President, Controller, and Treasurer of the Company on the same day.  Defendants responded to the SEC with a letter dated October 14, 2008, signed only by the "new" CFO, Scott Hurd.

285.    Certain responses appeared to conflict with defendants' earlier statements contained elsewhere.  *Cf. **March 20, 2008*** press release filed on Form 8-K: "The Company will also continue to perform strategic reviews of its stores base to capitalize on opportunities to reduce its occupancy costs and potentially close or sublease select store locations;" *with*  Linens' Response at 11: **"*In early April,*** given its accelerated cash needs, the Company significantly expanded CDG's role to assist the Company in looking at available alternatives for managing liquidity, its cost structure ***and its real estate portfolio, and for creating additional liquidity."*** [Emphasis added]  Where earlier in the same letter, Linens stated that CDG was hired ***in "mid-March"*** to "improve its liquidity and cash-flow forecasting and modeling."   *Id.*

## ADDITIONAL VIOLATIONS OF SEC RULES AND GAAP

286.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the

particular time.  Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

287.    GAAP "recognize[s] the importance of reporting transactions and events in accordance with their substance."  AU § 411.06.  GAAP should be applied consistently.  AU § 420.01 ("The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period").

288.    SEC Rule 13a-13 requires issuers to file quarterly reports. SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

289.    The SEC stated, in Securities Act Release No. 6349 (September 8, 1981), that:

> ... it is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

290.    In addition, as noted by the SEC in Accounting Series Release 173, it is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations.

291.    The Company's financial statements issued during the Class Period also violated the following fundamental GAAP principles, among others:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶34);

(b)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to these resources, and the effects of

transactions, events and circumstances that change resources and claims to these resources (FASB Statement of Concepts No. 1, ¶40);

(c)     The principle that financial reporting should provide information about an enterprise's financial performance during a period;  investors and creditors often use information about the past to help in assessing the prospects of an enterprise; thus, although investment and credit decisions reflect investors expectations about the future enterprise performance, those expectations are commonly based, at least partly, on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it; to the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should be reliable in that it represents what it purports to represent; that information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59).

(f)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2 ¶79);

(g)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are

adequately considered; the best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 95, 97);

(h)     The principle that disclosure of accounting policies should identify and describe the accounting principles followed by the reporting entity and the methods of applying those principles that materially affect the determination of financial position (APB Opinion No. 22, ¶12);

(i)     The principle that if no accrual is made for a loss contingency, then disclosure of the contingency shall be made when there is a reasonable possibility that a loss or an additional loss may have been incurred (Statement of Financial Accounting Standards No. 5, ¶ 10)

(j)     The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28, ¶22);

(k)     The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies have been removed, resolved, or have become immaterial (APB Opinion No. 28, ¶ 22);

(l)     The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28, ¶ 32).

292.     In addition, Regulation S-X (17 C.F.R. § 210), which "sets forth the form and content of and requirements for financial statements required to be filed [with the SEC]" applies to interim financial statements.  17 C.F.R. §§ 210.1-01(a)(2), 210.10.

293.     "The term 'financial statements' as used in [Regulation S-X] shall be deemed to include all notes to the statements and all related schedules."  17 C.F.R. § 210.1-01(b). Thus,

"the interim financial information shall include disclosures either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim financial information presented not misleading." 17 C.F.R. § 210.10(a)(5).

294.    "[D]isclosure shall be provided where events subsequent to the end of the most recent fiscal year have occurred which have a material impact on the registrant. . . . Notwithstanding the [foregoing], where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."  17 C.F.R. § 210.01(a)(5).

295.    "Any unaudited interim financial statements furnished shall reflect all adjustments which are, in the opinion of management, necessary to a fair statement of the results for the interim periods presented."  17 C.F.R. § 210.01(b)(8).

## NO SAFE-HARBOR

296.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The safe harbor expressly exempts from its protection statements made in made in financial statements. Further, many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking

92

statement was authorized and/or approved by an executive officer of the Company, who knew that those statements were false when made.  Statements or omissions contained in financial statements are expressly exempt from statutory safe-harbor protection.

## FIRST CLAIM FOR RELIEF

### Violation of Section 18 of the Exchange Act Against Defendants DiNicola, Rowan, Copses, Jhawar, Niebart, Pall, and Gatto

297.     Plaintiff repeats and reallege all of the foregoing allegations, as if fully set forth herein.

298.     This claim is brought pursuant to Section 18 of the Exchange Act by Plaintiff.

299.     As set for the above, these defendants made or caused to be made statements which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC.  Specifically, the Company's financial statements for the fiscal year ended December 31, 2006, were included in the Company's Form 10-K for that period, which was filed with the SEC.   In addition, each interim financial statement filed with the SEC on Form 10-Q referenced the materially false and misleading 2006 Form 10-K.

300.     Plaintiff read and relied upon the Company's Form 10-K and the financial statements contained therein, not knowing that they were false and misleading.  Specifically plaintiff relied on, among other statements and figures: the reported values of long-term assets, including Property and equipment, net, Goodwill, and Identifiable intangible assets, net, and impairment charges (or lack thereof) related to such.

301.     Each of the above listed defendants signed the Company's Form 10-K as alleged above.

302.     In connection with the purchase of the Notes, plaintiff and its agents specifically read and relied on the false and misleading statements of the Company's financial condition in the 2006 10-K. Plaintiff's reliance was reasonable.

303.     When the truth was finally revealed by Linens' abrupt filing for bankruptcy protection on May 2, 2008, plaintiff was damaged significantly by the resulting loss in value of the Notes.

304.     As a direct and proximate result of defendants' wrongful conduct, plaintiff suffered damage in connection with its purchase of the Notes in 2007.

305.     By virtue of the foregoing, defendants DiNicola, Rowan, Copses, Jhawar, Niebart, Pall, and Gatto violated Section 18 of the Exchange Act.

**SECOND CLAIM FOR RELIEF**

**Violation of Section 20 of the Exchange Act Against Defendants
Linens Investors LLC, NRDC Real Estate Advisors I LLC,
Silver Point Capital Fund Investments LLC and
Apollo Management V L.P. (the Entity Defendants)
And Defendants DiNicola, Rowan, Jhawar, Copses
Neibart, Pall and Gatto (the Individual Defendants)**

306.     Plaintiff repeats and realleges each of the allegations set forth above, as if fully set forth herein.

307.     The above named defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act (collectively the "Control Person Defendants").

308.     At all relevant times, the Control Person Defendants were controlling persons within the meaning of Section 20(a) of the Exchange Act.  Collectively, the Control Person Defendants owned 99.7% of the common stock of Linens.  Principals, affiliates and\or partners of the Control Person Defendants included the Chairman of the Board of Directors, defendant

DiNicola, and the majority of the Audit Committee, defendants Gatto and Copses.  Defendant

Jhawar was the Chairman of Linens' Compensation Committee, of which defendant Pall was

also a member.   Defendants DiNicola, Gatto, Copses, Jhawar, Neibart, Pall and Gatto

represented more than half of the reported active nine board members as of December 30, 2006

[2006 10-K\A at 9].

309.    By virtue of being majority shareholders of the Company and each having a

representative(s) directly or indirectly on the board of directors of Linens, the Entity Defendants

each had substantial control of events at Linens such as the appointment of members to Board

Committees and executive officers, such as defendants Rowan, Gatto, Copses, Pall, Jhawar, and

DiNicola.

310.    The Entity Defendants are also control persons of their agents and employees –

defendants DiNicola, Copses, Jhawar, Niebart, Pall and Gatto, were principals, officers,

"advisors," and\or partners of or to the respective Control Person Defendants.  The Entity

Defendants had the power to influence and control and did in fact influence and control, directly

or indirectly, the decision-making of defendants DiNicola, Rowan, Copses, Jhawar, Niebart, Pall,

and Gatto, including their publication and dissemination of the materially untrue 2006 10-K.

311.    Additionally, with respect to Apollo during a November 13, 2007 conference call

defendant DiNicola stated that he "talks to them everyday," in response to a question about

whether "Apollo is active in the business[?]."

312.    The Individual Defendants acted as controlling persons of Linens within the

meaning of Section 20(a) of the Exchange Act.  By reason of their beneficial ownership and\or

board and \or committee memberships, and\or executive positions the Individual Defendants had

the power and authority to cause the Company to engage in the wrongful conduct complained of herein.

313.     As a direct and proximate result of the conduct of the Control Person Defendants, plaintiff suffered damages in connection with its purchase of the Notes.

314.     By reason of the aforementioned conduct, each of the defendants named in this Claim is liable under Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, defendants DiNicola and Rowan are liable under the Exchange Act to plaintiff, who purchased the Notes in 2007, as alleged above.


## THIRD CLAIM FOR RELIEF

**Negligent Misrepresentation Against Defendants
DiNicola, Rowan, Copses, Jhawar, Niebart, Pall, and Gatto**

315.     Plaintiff repeats and realleges all previous allegations as if set forth fully herein.

316.     Defendants DiNicola, Rowan, Copses, Jhawar, Niebart, Pall, and Gatto signed the false and misleading 2006 Form 10-K and the same defendants, except for defendant Gatto signed the false and misleading 2007 Form 10-K.   By signing the Form 10-Ks defendants made materially false and misleading statements to plaintiff.

317.     Defendants owed duties of reasonable care and candor to Levine.  Defendants' false and misleading statements contained in conference calls, press releases and SEC filings, as well as the face-to-face meeting on October 26, 2007, as detailed above, breached these duties.

318.     Given Levine's face-to-face meeting with Linens' representatives, and other statements made in conference calls, press releases, and SEC filings, as detailed above, defendants intended for Levine to rely and act or forebear to act upon the negligent misrepresentations and omissions as contained therein.

319.    Levine justifiably relied upon defendants' misrepresentations and omissions in purchasing the Notes and\or refraining from selling same and was damaged thereby.

320.    As a result of its reliance on defendants' negligent statements and omissions, Levine sustained damages as a result of its investment in the Notes being significantly impaired by Linens' bankruptcy and liquidation.

321.    By reason of the foregoing, plaintiff is entitled to damages for all injuries proximately caused by plaintiff's reasonable reliance on defendants' negligent misrepresentations in an amount to be determined at trial, together with pre-judgment interest.

## BASIS OF ALLEGATIONS

322.    This complaint is pleaded in conformance with the Federal Rules of Civil Procedure and the PSLRA.   Plaintiff alleged the foregoing based upon investigation of plaintiff's counsel, which included but was not limited to a review of the Company's SEC and bankruptcy filings, court pleadings, press releases issued by the Company, conference call transcripts, media reports, consultation with an accounting expert, and interviews of agents and employees of plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Awarding plaintiff compensatory damages, together with appropriate prejudgment interest at the maximum rate allowable by law;

B.    Awarding plaintiff its costs and expenses for this litigation including reasonable attorneys' fees, experts' fees and other disbursements; and

C.    Granting such other and further relief as this Court deems just and proper.

**JURY TRIAL DEMANDED**


Dated:  September 23, 2009                    Respectfully submitted,

                                             *s/William C. Cagney*
                                             William C. Cagney (WCC-6025)
                                             **WINDELS MARX LANE &**
                                             **    MITTENDORF LLP**
                                             120 Albany Street Plaza
                                             New Brunswick, NJ 08901
                                             Tel: (732) 846-7600
                                             Email: wcagney@windelsmarx.com


                                             **GLANCY BINKOW & GOLDBERG LLP**
                                             Lionel Z. Glancy
                                             Peter Binkow
                                             1801 Avenue of the Stars, Suite 311
                                             Los Angeles, CA 90067
                                             Tel.: (310) 201-9150
                                             Fax: (310) 201-9160
                                             info@glancylaw.com

                                                  *- and -*

                                             Frederick W. Gerkens, III
                                             1430 Broadway, Suite 1603
                                             New York, NY 10018
                                             Tel: (212) 382-2221
                                             Fax: (212) 382-3944
                                             fgerkens@glancylaw.com


                                             ***Attorneys for Plaintiff***